## Richmond

### RALPH J. WHITE, III v. NORFOLK AND WESTERN RAILWAY COMPANY.

March 4, 1977.

Record No. 751407.

Present, I'Anson, C.J., Carrico, Harman, Poff and Compton, JJ.

*Henry E. Howell, Jr.; J. Gray Lawrence, Jr. (Howell, Anninos, Daugherty & Brown,* on briefs), for plaintiff in error.

*William T. Prince (Williams, Worrell, Kelly & Greer,* on briefs), for defendant in error.

COMPTON, J., delivered the opinion of the court.

In this personal injury action brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, we must

decide whether, under the circumstances of this case, the exclusive remedy is under the Federal Longshoremen's and Harbor Workers' Compensation Act (LHWCA or the Act), 33 U.S.C. §§ 901-950.

Plaintiff-appellant Ralph J. White, III, filed suit in June of 1974 in the court below against his employer, defendant-appellee Norfolk and Western Railway Company (N & W). During the period of time in question, plaintiff worked as an electrician in rooms housing electrical equipment at defendant's Lambert's Point terminal in Norfolk. Plaintiff alleged defendant negligently failed to furnish him a safe place to work and negligently failed to provide him with protective equipment, and as a result of excessive noise in the electrical rooms he suffered permanent damage to his hearing and developed a constant ringing in his ears. The FELA case was tried in November of 1974 and the jury found for the defendant. Thereafter, the trial judge sustained plaintiff's motion to set the verdict aside and ordered a new trial.

In June of 1975, shortly before the scheduled retrial, defendant filed a motion to dismiss on the ground the court lacked jurisdiction over the subject matter in that plaintiff's exclusive remedy was under the LHWCA. Following an evidentiary hearing, the trial court sustained the motion. We granted plaintiff a writ of error to the July 29, 1975 order dismissing plaintiff's action.

Enacted in 1927, the LHWCA, like the FELA, is a federal industrial accident statute. The enactment emanated from the problems created when some of the States applied State workmen's compensation acts to claims of longshoremen and other harbor workers. 1 M. Norris, *The Law of Maritime Personal Injuries* 103 (3d ed. 1975).[1] These claims, for the most part, stemmed from injuries aboard vessels in navigable waters and thus were in the distinctly Federal field of maritime torts, even though the claims arose within the territorial boundaries of the States. After the United States Supreme Court, in a line of pre-1927 cases, barred these State awards to maritime workers, Congress enacted this comprehensive maritime workers compensation law.

---

[1] "The longshoreman, as the name implies, is a shoreside worker whose principal activity is the loading and unloading of ship's cargo." Norris, *supra* at 6.

In 1972, extensive changes were made in the LHWCA. Prior to 1972, the Act provided that compensation was payable only if the claim arose "upon navigable waters" including "any dry dock" and only if recovery for the disability or death could not validly be provided by State law through workmen's compensation proceedings. The Supreme Court thus construed the earlier act "to reimburse only injuries seaward of the pier, e.g. on shipboard or other like structure within the narrow confines of the admiralty tort jurisdiction." *Stockman* v. *John T. Clark & Son, Inc.*, 539 F.2d 264, 270 (1st Cir. 1976). Before the 1972 amendments, the Act was considered to be a mere "supplement to state workmen's compensation laws, designed not to supersede or improve upon those laws but to fill a gap which the states were without jurisdiction to fill." *Id.* at 270 (footnote omitted). Pre-1972 coverage under the Act was "overwhelmingly situs-oriented." *Jacksonville Shipyards, Inc.* v. *Perdue*, 539 F.2d 533, 537 (5th Cir. 1976). For example, coverage was granted to a longshoreman injured aboard the vessel but denied if his injury occurred several feet from the ship on the pier. 539 F.2d at 270. In *Nacirema Co.* v. *Johnson*, 396 U.S. 212 (1969), the claims of three longshoremen were denied when two were injured and a third killed, on piers permanently affixed to the shore, while they were attaching cargo from railroad cars to ships' cranes. The Supreme Court rejected the argument that the 1927 Act provided a broader coverage which was premised on " 'status' of the longshoreman employed in performing a maritime contract." 396 U.S. at 215. The Court noted:

> "Congress might have extended coverage to all longshoremen by exercising its power over maritime contracts.[7] [7. The admiralty jurisdiction in tort was traditionally 'bounded by locality,' encompassing all torts that took place on navigable waters. By contrast, admiralty contract jurisdiction 'extends over all contracts, (wheresoever they may be made or executed . . .) which relate to the navigation, business or commerce of the sea.' Since a workmen's compensation act combines elements of both tort and contract, Congress need not have tested coverage by locality alone. As the text indicates, however, the history of the Act shows that Congress did indeed do just that.]" 396 U.S. at 215-16 (citations omitted).

The Court also observed that movement of the coverage line landward should be accomplished by legislative and not judicial action. 396 U.S. at 224.

■ The inequities resulting from the fact that coverage under the Act stopped at the water's edge prompted Congress in 1972 to enlarge the scope of the Act. *See* H.R. Rep. No. 1441, 92d Cong., 2d Sess. 10, *reprinted in* [1972] U.S. Code Cong. & Ad. News 4698, 4707-08. By enactment of the 1972 amendments, Congress, *inter alia,* expanded the "situs" requirement; it also enhanced the significance of the "status" requirement by defining the class of persons who are "employees" entitled to coverage under the Act.

Section 3(a) of the Act sets forth the situs where a covered claim must occur, and provides in pertinent part as follows, with the Amendment made in 1972 shown by italics:

> "Compensation shall be payable ... in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any *adjoining pier, wharf,* dry dock, *terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). ...*" 33 U.S.C. § 903(a).

Section 2(3) of the Act defines the status which the employee must occupy to be covered, and provides as follows, with the 1972 Amendment indicated by italics:

> "The term 'employee' *means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term* does not include a master or member of a crew of any vessel, *or* any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U.S.C. § 902(3).

The Act further provides that an employer, defined in the Act, *id.* § 902(4), shall be liable for compensation of his employees, *id.* § 904, and that such liability shall be exclusive and in place of all other liability of such employer to the employee. *Id.* § 905.

As we turn to the facts, it will become apparent that the critical question presented by this case is whether plaintiff was a "person engaged in maritime employment" and thus an "employee" within the meaning of the Act. To make this determination, a thorough understanding of the coal-loading process from beginning to end, and the plaintiff's function as it relates thereto, is essential; it is also relevant that other N & W employees performed purely maritime work.

The evidence which was developed during the hearing on the motion to dismiss is without substantial conflict. N & W is a rail carrier of coal and operates the Lambert's Point facilities, which include railroad yards and two coal piers, Piers 5 and 6, extending into the navigable waters of the Elizabeth River, a part of Hampton Roads. Pier 5 is about 1000 feet long, Pier 6 is approximately 1600 feet in length with a 200-foot dolphin extension. The coal is brought to Lambert's Point by rail, to be shipped worldwide, from mines in West Virginia, Kentucky and Pennsylvania; it is sent to Norfolk from staging areas in Roanoke and Crewe, but only when a designated ship is scheduled to arrive at Lambert's Point to receive it.

When the ship's arrival time is known, transfer of the coal from the staging areas to classification or storage yards at Lambert's Point is coordinated by N & W. Upon arrival in Hampton Roads, the vessel stands off Lambert's Point until called to the piers by N & W. Defendant arranges with Curtis Bay Towing Company for tug service to aid in berthing. One of the tugs employed is owned by N & W and operated by Curtis Bay to "service" the coal piers exclusively. As the ship approaches the pier designated by defendant's piermaster, line tenders employed by N & W handle the lines to secure the ship to the pier. These line tenders may be shop helpers, helper machinists, helper electricians, or helpers of any description.

When docking of the vessel is completed, the following procedure is used to transfer the coal from the storage yards to the coal piers and thence into the ship's hold. The loaded coal cars are brought from the classification or storage yards to the Barney or hump yard, so named because its tracks are laid at a 3.5 per cent upgrade, by a hump crew composed of an engineer, a fireman, a conductor and two brakemen. The 20 or 30 coal cars are shoved by the hump engine into the yard where the cars'

brakes are applied. Individual cars are then uncoupled manually upon orders of a conductor and allowed to roll unassisted down a 1.5 per cent grade over scales which weigh the cars and through the thawing chamber to the Barney Pit where the cars are classified according to point of origin.

After classification, the cars are pushed to the Barney dumper house, approximately 425 feet from the head of Pier 5, where the cars are turned over and the coal shaken into hopper receiving bins, each of which holds 200 tons of coal. A series of conveyor belts transfers the coal from the dumper to the piers. The A belt carries the coal from the hopper to B belt which runs underground to the BC transfer house approximately 75 feet from the head of Pier 6. The coal is transferred to C belt which feeds belts D and E located within shiploader number 1, one of two shiploaders located on Pier 6. Shiploader number 2 is fed by a similar series of belts designated A1, B1, C1, D1 and E1. A shiploader is a structure, 196 feet in height, affixed to the pier and operated from a cab 60 feet high, which feeds coal from the conveyor belts into the ship's hold by means of a telescoping chute.

The loading operation is a continuous process from the time the cars leave the Barney yard until the coal drops into the ship. During the process, a deck foreman, employed by N & W, is stationed on the vessel. He supervises the operator of the shiploader, keeps in close touch with the chief officer and captain of the ship, and specifies the direction the coal should flow into the ship's hold.

N & W also provides trimming service, which is the mechanical placement of coal in the ship's hold. The railway company also owns a floating barge which is used by electricians and machinists to work on the equipment around the coal piers.

We now examine the plaintiff's duties and the electrical functions carried on in the rooms in question. Plaintiff alleged his hearing loss resulted from his activities in: The Barney dumper house electrical room, the BC transfer house electrical room, the two electrical rooms in the shiploaders on Pier 6, and the Pier 5 motor house electrical room. Electrical equipment in those locations provides the power to control the loading process from the time the coal cars are placed on the Barney dumpers until the coal is loaded into the ships. Plaintiff claims his injury

was sustained during a period of about two years when he was working in the electrical rooms five nights each week. He was originally employed by N & W in 1969 as a line tender, then entered an electrical apprenticeship, and in December of 1972 was assigned by N & W to perform electrical duties in the foregoing specific areas.

The record shows plaintiff did not operate any of the machinery during the loading process, but that he maintained and repaired the electrical room equipment in the named enclosed spaces. In the Barney dumper room, the equipment converted AC power to DC power through a motor generator which in turn furnished the power and control to dump the coal from the cars and the power to move the Barney, which is a mechanical device used to shove the coal cars onto the dumper. In the BC transfer house electrical room, the equipment provided electrical generation and power supply for the B, B1, C and C1 conveyor belts.

Electrical equipment was also located on Pier 5, which unlike Pier 6 was not equipped with shiploaders. The Pier 5 electrical equipment raised a single coal car and dumped the coal onto a pan from which the coal flowed by gravity through a telescope into the vessel.

Electric power operates the Pier 6 shiploaders. The electrical rooms are located above the operator's cab and are about 113 feet above the deck of the pier. Plaintiff worked in these rooms and also on exterior maintenance platforms, which hang partially over the pier and partially over the water. There were electrical "elements" on the Pier 6 telescopic chute which prevented the chute from "going up too high." Around the bottom of the chute was a hydraulic system for trimming, controlled electronically. The chute hung directly in the center of the vessel's hold when the ship was being loaded. If the rotating trim equipment malfunctioned, plaintiff would go aboard the ship to repair that equipment. When a vessel was not berthed at Pier 6, metal staging on the pier with an exterior platform about 25 feet above dock level was swung out over the water and around the telescopic chute to afford maintenance access by the electricians to the chute's electrical equipment.

Clearly, and no issue is raised as to this, N & W is an "employer" within the meaning of the Act. "Employer" is

defined as "an employer *any* of whose employees are employed in maritime employment, in whole or *in part,* upon the navigable waters of the United States (including any adjoining pier, . . .)" *Id.* § 902(4) (emphasis added). *See Nogueira* v. *New York N.H. & H.R.R.,* 281 U.S. 128 (1930). N & W's employees who manned the barge and tended the lines bring the railway company within the foregoing definition. *See Thornton* v. *Norfolk & W. Ry.,* No. 75-345-N (E.D. Va., *mem. order* Dec. 10, 1975) *interlocutory appeal denied,* No. 75-8433 (4th Cir. March 18, 1976).

In addition, there is no issue that the injury took place in a situs where a covered claim must occur, within the meaning of section 3(a) of the Act. Each of the five electrical rooms, two ashore and three on the piers, in which plaintiff worked were "upon the navigable waters of the United States", defined in section 3(a) as "including any adjoining pier, . . . or other adjoining area customarily used by an employer in loading, . . . a vessel."

Therefore, because plaintiff was injured in a covered situs and because N & W is an "employer" bound under the Act to pay compensation to covered "employees", the issue, as we have stated, is whether plaintiff was an "employee" within the meaning of the Act; specifically, whether plaintiff was a "person engaged in maritime employment" under section 2(3). We conclude he was not and reverse.

On brief, defendant argues that "whether or not a person works for a stevedore [plaintiff did not], and whether or not a person belongs to a maritime union [plaintiff did not], if in his employment he performs duties which are necessary to, and integral parts of, the loading of cargo upon a vessel, then such a person is 'engaged in maritime employment' and thus becomes an 'employee' as statutorily defined." N & W contends "plaintiff's duties of maintaining and repairing the motor equipment used to generate electricity for operation of the automatic coal loading apparatus (which he was doing when allegedly injured), put the plaintiff in the class of persons 'engaged in maritime employment.'" The company further urges that:

"If the dumping equipment, conveyor belts and shiploaders are customarily used in loading coal into the vessels — as surely they are — then those employees who operate and

maintain the equipment are engaged in the loading. The plaintiff's connection with these operations is not peripheral. He spends his time in the five locations at the coal piers while the coal is being loaded into the vessels maintaining the efficiency of the loading equipment and serving as a 'trouble-shooter.' When trouble occurs, for instance, he stops the operation and it is not started again except by his action or if the operation stops because of electrical malfunction it is not commenced without the plaintiff's involvement. At times he is located high above and directly over the ship while coal flows from the belts into the shiploader and down into the ship's hold.

"It must be borne in mind also that what generally may be conceived as loading a vessel — the use of slings and pallets, the hoisting and lowering by ship's gear, the stacking and moving of cartons and bales — is no less loading because sophisticated equipment and modern loading techniques are used by different people with skills of many kinds."

At the bar, N & W urged us to apply the "functional relationship" test recently used in *Sea-Land Service, Inc.* v. *Director, Office of Workers' Compensation*, 540 F.2d 629, 638 (3d Cir. 1976). Defendant says that because plaintiff's employment involved "working in these motor rooms, all of his activity was 'functionally related' to the loading of coal on ships; none of his activity was 'functionally related' to the operation of trains or to the operation of a railroad in the sense of moving cars along rails."

A close examination of plaintiff's precise duties, and their relation to the actual loading of the vessels, when considered with the legislative purpose of the 1972 Amendments, will demonstrate the fallacy of defendant's foregoing contentions.

The Act alone does not provide a satisfactory solution to the question which confronts us, because of the imprecise meaning of "maritime employment", "longshoreman", and "persons engaged in longshoring operations" as used in the statute. *See I.T.O. Corp.* v. *Benefits Review Board*, 529 F.2d 1080, 1084 (4th Cir. 1975), *reheard en banc, aff'd. in part by an equally divided court and rev'd. in part*, 542 F.2d 903 (4th Cir. 1976). Consequently, the legislative history of the Amendments must be considered to ascertain the intent of Congress. This

intent has been aptly summarized in *Weyerhaeuser Co.* v. *Gilmore*, 528 F.2d 957 (9th Cir. 1976), a case in which the sole issue also was whether the claimant, at the time of the injury, was an employee "engaged in maritime employment" within the meaning of section 2(3) of the Act. In holding the claimant was not so engaged, the court stated:

> "The 1972 amended prerequisite of 'maritime employment' is a clearly expressed congressional perpetuation of the essential element of admiralty jurisdiction over the employee. In other words, the fixed federal compensation is provided in lieu of the uncertainty of a recovery by an injured ship worker for a maritime tort. The occupational hazards intended to be guarded against are the traditional hazards to the ship's service employee arising in the course of his employment; *i.e.*, the perils of the sea and an unseaworthy vessel recognized under maritime laws. Accordingly we believe that to be entitled to the benefits of [the Act], an employee's employment must have a realistic relationship to the traditional work and duties of a ship's service employment. Otherwise the clear and unambiguous congressional language of 'maritime employment' is nullified and rendered to read 'any employment.'
>
> "We hold that for an injured employee to be eligible for federal compensation under [the Act], his own work and employment, as distinguished from his employer's diversified operations, including maritime, must have a realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters,' with the further condition that the injury producing the disability occurred on navigable waters or adjoining areas as defined in § 903. [Citations omitted]" *Id.* at 961.

For a comprehensive analysis of the legislative history of the 1972 Amendments, see *I.T.O. Corp.* v. *Benefits Review Board*, *supra*, 529 F.2d at 1085-87.

Applying the section 2(3) language defining "employee" in the light of what we perceive to have been Congress' purpose when the 1972 Amendments were adopted, we do not believe plaintiff's duties, in the electrical rooms where the injury allegedly occurred, had a realistically significant relationship to the

loading of cargo on ships. Stated differently, when plaintiff was injured he was not *directly involved* in the loading of coal. *See Jacksonville Shipyards, Inc.* v. *Perdue, supra,* 539 F.2d at 539.

Plaintiff was not actually handling any cargo, either manually or mechanically, as was the case in the decisions principally relied on by N & W.[2] Moreover, plaintiff was not manipulating (except to test) any of the controls of the electrical mechanism, which furnished the power for this automated loading process. Rather, he was only *maintaining* the electrical devices on the shore and attached to the pier, work which is not the traditional work of a ship's service employee. Plaintiff was at least one step removed from a realistically significant relationship and from a direct involvement with the loading of vessels. The mere fact some of plaintiff's cumulative injury was sustained out over the Elizabeth River, while he worked inside the electrical rooms of the Pier 6 shiploaders, does not convert his status from that of a railroad electrician to that of a maritime worker.

For these reasons, we hold plaintiff was not a covered "employee" within the meaning of the Act. Hence, the trial court erred in sustaining defendant's motion to dismiss. Accordingly, the order dismissing plaintiff's FELA action will be reversed and the case will be remanded for a new trial.

*Reversed and remanded.*

---

[2] *See, e.g., Pittston Stevedoring Corp.* v. *Dellaventura,* 544 F.2d 35 (2d Cir. 1976) *cert. granted sub nom. Northeast Marine Terminal Co.* v. *Caputo,* 429 U.S. 998 (1977), in which one claimant, a "checker" of cargo, slipped and fell because of ice on a pier while checking cargo being removed from a container, which had been unloaded from a ship a few days before at another pier; and in which another claimant, a "hustler" operator who moved containers within a terminal, was injured when he placed a container on a receiving platform on a dock in preparation for loading the container aboard the ship.