## CHESAPEAKE & OHIO RAILWAY CO.
### *v.* SCHWALB ET AL.

No. 87–1979.  Argued October 3, 1989—Decided November 28, 1989*

---

*Together with No. 88–127, *Norfolk & Western Railway Co.* v. *Goode*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which MARSHALL and O'CONNOR, JJ., joined, *post*, p. 49. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 50.

*William T. Prince* argued the cause for petitioners in both cases. With him on the briefs were *Edward L. Oast, Jr., John Y. Richardson, Jr.,* and *Joan F. Martin.*

*Christine Desan Husson* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With her on the brief were *Acting Solicitor General Bryson,*

*Deputy Solicitor General Shapiro, Allen H. Feldman,* and *Charles I. Hadden.*

*Bruce A. Wilcox* argued the cause for respondents in both cases and filed a brief for respondent in No. 88–127. With him on the brief were *Richard J. Tavss* and *Ray W. King. C. Gerald Thompson* filed a brief for respondents in No. 87–1979.†

JUSTICE WHITE delivered the opinion of the Court.

Nancy J. Schwalb and William McGlone, respondents in No. 87–1979, were employees of petitioner Chesapeake and Ohio Railway Company (C & O), and were injured while working at petitioner's terminal in Newport News, Virginia, where coal was being loaded from railway cars to a ship on navigable waters. Robert T. Goode, respondent in No. 88–127, was injured while working for petitioner Norfolk and Western Railway Company (N & W) at its coal loading terminal in Norfolk, Virginia. If respondents' injuries are covered by the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. §§ 901–950 (1982 ed. and Supp. V), the remedy provided by that Act is exclusive and resort may not be had to the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60 (1982 ed. and Supp. V), which provides a negligence cause of action for railroad employees. The Supreme Court of Virginia held in both cases that the LHWCA was not applicable and that respondents could proceed to trial under the FELA. We reverse.

I

At the C & O facility, a mechanical conveyor-belt system transports coal from railroad hopper cars to colliers berthed at the piers. The loading process begins when a hopper car

†*Stephen A. Trimble, John M. Clifford,* and *John J. Delaney* filed a brief for the Association of American Railroads et al. as *amici curiae* urging reversal.

is rolled down an incline to a mechanical dumper which is activated by trunnion rollers and which dumps the coal through a hopper onto conveyor belts. The belts carry the coal to a loading tower from which it is poured into the hold of a ship. The trunnion rollers are located at each end of the dumper. Typically, some coal spills out onto the rollers and falls below the conveyor belts during the loading process. This spilled coal must be removed frequently to prevent fouling of the loading equipment. Respondents Nancy Schwalb and William McGlone both worked at C & O's terminal as laborers doing housekeeping and janitorial services. One of their duties was to clean spilled coal from the trunnion rollers and from underneath the conveyor belts. Both also performed ordinary janitorial services at the loading site. McGlone's right arm was severely injured while he was clearing away coal beneath a conveyor belt. Schwalb suffered a serious head injury when she fell while walking along a catwalk in the dumper area. At the time, she was on her way to clean the trunnion rollers.

At N & W's terminal, a loaded coal car is moved to the dumper where it is locked into place by a mechanical device called a "retarder." The dumper turns the car upside down. The coal falls onto conveyor belts and is delivered to the ship via a loader. Respondent Robert Goode was a pier machinist at N & W's terminal. His primary job was to maintain and repair loading equipment, including the dumpers and conveyor belts. Goode injured his hand while repairing a retarder on one of N & W's dumpers. Loading at that dumper was stopped for several hours while Goode made the repairs.

The three respondents commenced separate actions in Virginia trial courts under the FELA. Petitioners responded in each case by challenging jurisdiction on the ground that the LHWCA provided respondents' sole and exclusive remedy. See 33 U. S. C. § 905(a) (1982 ed., Supp. V). All three trial courts held evidentiary hearings and concluded that respondents were employees covered by the LHWCA. The suits

were dismissed and respondents appealed. The Supreme Court of Virginia consolidated the appeals of Schwalb and McGlone and reversed the dismissals. 235 Va. 27, 365 S. E. 2d 742 (1988).

Relying on one of its earlier decisions, *White* v. *Norfolk & Western R. Co.*, 217 Va. 823, 232 S. E. 2d 807 (1977), the court stated that the key question was whether an employee's activities had a realistically significant relationship to the loading of cargo on ships. 235 Va., at 31, 365 S. E. 2d, at 744. Pointing to expressions in our opinion in *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977), that landward coverage of the LHWCA was limited to the "'essential elements'" of loading and unloading, the court concluded that "the 'essential elements' standard is more nearly akin to the 'significant relationship' standard we adopted in *White*" than the broader construction argued by C & O. 235 Va., at 33, 365 S. E. 2d, at 745. Applying the *White* standard, the court ruled that employees performing purely maintenance tasks should be treated no differently under the Act than those performing purely clerical tasks and held that Schwalb and McGlone were not covered. The court later dealt with the Goode case in an unpublished order, relying on its decision in *Schwalb* and reversing the trial court's judgment that an employee who repairs loading equipment is covered by the LHWCA. No. 870252 (Apr. 22, 1988), App. to Pet. for Cert. in No. 88–127, p. 17A.

Because the Supreme Court of Virginia's holding in these cases was contrary to the position adopted by Federal Courts of Appeals, see, *e. g., Harmon* v. *Baltimore & Ohio R. Co.*, 239 U. S. App. D. C. 239, 244–245, 741 F. 2d 1398, 1403–1404 (1984); *Sea-Land Services, Inc.* v. *Director, Office of Workers' Compensation Programs*, 685 F. 2d 1121, 1123 (CA9 1982) *(per curiam); Hullinghorst Industries, Inc.* v. *Carroll*, 650 F. 2d 750, 755–756 (CA5 1981); *Garvey Grain Co.* v. *Director, Office of Workers' Compensation Programs*, 639 F. 2d 366, 370 (CA7 1981) *(per curiam); Prolerized New England*

*Co.* v. *Benefits Review Board,* 637 F. 2d 30, 37 (CA1 1980), we granted certiorari to resolve the conflict. 489 U. S. 1009–1010 (1989).

## II

For the LHWCA to apply, the injured person must be injured in the course of his employment, 33 U. S. C. § 902(2) (1982 ed.); his employer must have employees who are employed in maritime employment, § 902(4); the injury must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)," 33 U. S. C. § 903(a) (1982 ed., Supp. V); and the employee who is injured within that area must be a "person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include—" certain enumerated categories of employees, § 902(3). It is undisputed that the first three of these requirements are satisfied in these cases. The issue is whether the employees were engaged in maritime employment within the meaning of § 902(3).

The employment that is maritime within the meaning of § 902(3) expressly includes the specified occupations but obviously is not limited to those callings. *Herb's Welding, Inc.* v. *Gray,* 470 U. S. 414, 423, n. 9 (1985); *P. C. Pfeiffer Co.* v. *Ford,* 444 U. S. 69, 77–78, n. 7 (1979). The additional reach of the section has been left to the courts sitting in review of decisions made in the Department of Labor, which is charged with administering the Act. In the course of considerable litigation, including several cases in this Court, it has been clearly decided that, aside from the specified occupations, land-based activity occurring within the § 903 situs will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel. This is a sensible construction

of § 902(3) when read together with § 903(a), particularly in light of the purpose of the 1972 amendments to the LHWCA which produced those sections.

Prior to 1972, the Act applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship. Congress acted to obviate this anomaly: § 903(a) extended coverage to the area adjacent to the ship that is normally used for loading and unloading, but restricted the covered activity within that area to maritime employment. Pub. L. 92–576, 86 Stat. 1251. There were also specific exclusions in both § 902(3) and § 903; those exclusions were expanded in 1984. See Pub. L. 98–426, § 2(a), 98 Stat. 1639.

In *Northeast Marine Terminal Co.* v. *Caputo, supra*, we held that the 1972 amendments were to be liberally construed and that the LHWCA, as amended, covered all those on the situs involved in the essential or integral elements of the loading or unloading process. *Id.*, at 267, 268, 271. But those on the situs not performing such tasks are not covered. *Id.*, at 267. This has been our consistent view. *P. C. Pfeiffer Co.* v. *Ford, supra*, held that workers performing no more than one integral part of the loading or unloading process were entitled to compensation under the Act. *Id.*, at 82. We also reiterated in *Herb's Welding, Inc.* v. *Gray, supra*, that the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act. *Id.*, at 424.

In the cases before us, respondents were connected with the loading process only by way of the repair and maintenance services that they were performing when they were injured. There is no claim that if those services are not

maritime employment, respondents are nevertheless covered by the LHWCA.  See *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S., at 272–274.  Only if the tasks they were performing are maritime employment, are respondents in these cases covered by the Act.

Although we have not previously so held, we are quite sure that employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act.  Such employees are engaged in activity that is an integral part of and essential to those overall processes.  That is all that § 902(3) requires.  Coverage is not limited to employees who are denominated "longshoremen" or who physically handle the cargo.  Nor are maintenance employees removed from coverage if they also have duties not integrally connected with the loading or unloading functions.  Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment.  When machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured.  It is irrelevant that an employee's contribution to the loading process is not continuous or that repair or maintenance is not always needed.  Employees are surely covered when they are injured while performing a task integral to loading a ship.

Our conclusion that repair and maintenance to essential equipment are reached by the Act is buttressed by the fact that every Court of Appeals to have addressed the issue has arrived at the same result.  See the cases cited *supra*, at 44–45.  As evidenced by the *amicus* brief of the United States filed in these cases, the Secretary of Labor also agrees that such repair and maintenance employees are engaged in maritime employment within the meaning of § 902(3), and the Benefits Review Board also has consistently taken this view, see, *e. g.*, *Wuellet* v. *Scappoose Sand & Gravel Co.*, 18 BRBS 108, 110–111 (1986); *De Robertis* v. *Oceanic Container Serv-*

*ice, Inc.*, 14 BRBS 284, 286–287 (1981); *Cabezas* v. *Oceanic Container Service, Inc.*, 11 BRBS 279, 283–288 (1979), and cases cited therein.

## III

Applying the standard expressed in our cases, we conclude that each of the respondents is covered by the LHWCA. The Supreme Court of Virginia held that Goode was not covered because in its view repair of equipment essential to the loading process was not maritime employment. This was error. It makes no difference that the particular kind of repair Goode was doing might be considered traditional railroad work or might be done by railroad employees wherever railroad cars are unloaded. The determinative consideration is that the ship loading process could not continue unless the retarder that Goode worked on was operating properly. It is notable that the loading actually was stopped while Goode made the repairs and that one of his supervisors apparently expressed the desire that Goode hurry up so that the loading could continue.

Respondents Schwalb and McGlone also were performing duties essential to the overall loading process. There is testimony in the record that if the coal which spills onto the rollers is not periodically removed, the rollers may become clogged and the dumper will become inoperable. App. 57, 92. The same is true of the coal that falls beneath the conveyor belts. *Ibid.* Testimony indicated that a buildup of such coal could eventually foul the conveyors and cause them to be shut down. Equipment cleaning that is necessary to keep machines operative is a form of maintenance and is only different in degree from repair work. Employees who are injured on the situs while performing these essential functions are covered by the LHWCA.

## IV

For the reasons given above, the judgments of the Supreme Court of Virginia are reversed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE O'CONNOR join, concurring.

Although I join the opinion of the Court, I write separately to emphasize that I do not understand our decision as in any way repudiating the "amphibious workers" doctrine this Court articulated in *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249, 272–274 (1977). We hold today that respondents Schwalb, McGlone, and Goode are covered by the LHWCA since they were injured while performing tasks essential to the process of loading ships. In light of *Northeast Marine Terminal Co.*, however, it is not essential to our holding that the employees were injured while actually engaged in these tasks. They are covered by the LHWCA even if, at the moment of injury, they had been performing other work that was not essential to the loading process.

As the Court explained in *Northeast Marine Terminal Co.*, Congress, in amending the LHWCA in 1972, intended to solve the problem that under the pre-1972 Act employees would walk in and out of LHWCA coverage during their workday, if they performed some tasks over water and other tasks ashore. Congress wanted

> "to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover 'longshoremen,' it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity." *Id.*, at 273.

Later, in *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69 (1979), we said that the "crucial factor" in determining LHWCA coverage "is the nature of the activity to which a worker *may be assigned.*" *Id.*, at 82 (emphasis added). Although the employees in *Pfeiffer* were actually engaged in longshoring work

at the time of their injuries, we noted: "Our observation that Ford and Bryant were engaged in maritime employment at the time of their injuries does not undermine the holding of *Northeast Marine Terminal Co. . . .* that a worker is covered if he spends some of his time in indisputably longshoring operations . . . ." *Id.*, at 83, n. 18.

To suggest that a worker like Schwalb, McGlone, or Goode, who spends part of his time maintaining or repairing loading equipment, and part of his time on other tasks (even general cleanup, or repair of equipment not used for loading), is covered only if he is injured while engaged in the former kind of work, would bring the "walking in and out of coverage" problem back with a vengeance. We said in *Northeast Marine Terminal Co.* that "to exclude [a worker] from the Act's coverage in the morning but include him in the afternoon would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate." 432 U. S., at 274.

I join the Court's opinion on the specific understanding that it casts no shadow on the continuing validity of *Northeast Marine Terminal Co.*

JUSTICE STEVENS, concurring in the judgment.

Had this case arisen in 1977, I would have subscribed to the interpretation of the Longshore and Harbor Workers' Compensation Act that the Supreme Court of Virginia adopted in *White* v. *Norfolk & Western R. Co.*, 217 Va. 823, 232 S. E. 2d 807, cert. denied, 434 U. S. 860 (1977). I continue to believe that the text of the Act "merely provides coverage for people who do the work of longshoremen and harbor workers—amphibious persons who are directly involved in moving freight onto and off ships, or in building, repairing, or destroying ships," and that the Act's history in no way clouds the text's plain import. See *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297, 328, 342 (1983) (STEVENS, J., dissenting). The *White* opinion reaches a similar conclusion. See *White*, 217 Va., at 833, 232 S. E. 2d, at 813 (employing a "direct involvement" test).

Yet, as the majority correctly observes, *ante*, at 44–45, the Federal Courts of Appeals have consistently interpreted the Act's status requirement to encompass repair and maintenance workers. That uniform and consistent course of decision has established a reasonably clear rule of law that I feel bound to respect. Cf. *Commissioner* v. *Fink*, 483 U. S. 89, 102–103 (1987) (STEVENS, J., dissenting). I therefore concur in the Court's judgment.