EDITH BROWN CLEMENT, Circuit Judge,
with whom JOLLY, JONES, SMITH, PRADO, OWEN, and ELROD, Circuit Judges, join, concurring:
I fully concur in the majority’s formulation of the situs inquiry, finding it to be a faithful application of the plain text of the LHWCA. I write separately to explain why the status requirement is not met in this case, even under the generous precedent established by this circuit and the Supreme Court.
This en banc decision to return the situs inquiry to its textual roots will certainly impose a natural limitation on the status of employees who are eligible under the LHWCA. But both Congress and the Supreme Court have acknowledged that the situs and status inquiries are separate and distinct, and that a claimant must establish both before he can recover under the LHWCA. See, e.g., 33 U.S.C. §§ 903(a), 902(3); Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 415-16, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). It is important to clarify the status test to ensure that this circuit’s application of the LHWCA as a whole remains true to its proper purpose. As the status inquiry provides an alternative ground to vacate the decision of the Benefits Review Board, this discussion is not dictum. U.S. v. Potts, 644 F.3d 233, 237 n. 3 (5th Cir.2011) (explaining that an alternative holding is binding precedent).[1]
*395 I. Controlling Precedent
An individual located on a proper situs will qualify as a covered employee under the LHWCA only if he is also “engaged in maritime employment.” 33 U.S.C. § 902(3). This statute provides that, for example, “any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker,” has the status of a maritime employee. Id. The Supreme Court has acknowledged that the Act also extends to cover workers other than those in the delineated occupations, Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 45, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989), as long as the worker is “engaged in loading, unloading, repairing, or building a vessel.” P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 79, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (quoting S.Rep. No. 92-1125 (1972), 1972 U.S.C.C.A.N. 2708 and H.R.Rep. No. 92-1441 (1972)), 1972 U.S.C.C.A.N. 4698.
As acknowledged in Chesapeake & Ohio Railway Co. v. Schwalb, “the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act.” 493 U.S. at 46, 110 S.Ct. 381 (citing Herb’s Welding, 470 U.S. at 424, 105 S.Ct. 1421). In the context of the LHWCA, loading and unloading includes those tasks incident to the process of “handling of cargo as it moves between sea and land transportation,” Ne. Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 267, 273-74, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), because such tasks are of the sort traditionally performed by longshoremen, see Ford, 444 U.S. at 74, 81-82, 100 S.Ct. 328. Thus, “land-based activity occurring within the § 903 situs will be deemed maritime ... if it is an integral or essential part of loading or unloading a vessel,” viewed from the position of a longshoreman or harborworker. Schwalb, 493 U.S. at 45, 110 S.Ct. 381 (emphasis added). Maritime employment does not extend to workers “beyond those actually involved in moving cargo between ship and land transportation.” Herb’s Welding, 470 U.S. at 424,105 S.Ct. 1421.
In Schwalb, the Supreme Court recognized that “employees who are injured while maintaining or repairing equipment essential to the loading or unloading process,” in addition to longshoremen who physically handle cargo, are covered by the LHWCA. 493 U.S. at 47, 110 S.Ct. 381. It premised this conclusion on the fact that the process of loading and unloading vessels would stop if the machinery used by the longshoremen became broken, clogged, or fouled. An individual who either fixed that machinery or ensured that such a breakdown did not occur was “just as vital to and an integral part of the loading process as the operator of the equipment,” id., sufficient to trigger application of the LHWCA.
This circuit applied a version of this test in Hullinghorst Indus., Inc. v. Carroll, 650 F.2d 750, 754-58 (5th Cir.1981), to hold that a carpenter injured while building scaffolding beneath a pier was a maritime employee for purposes of the LHWCA. Although the carpenter had no direct involvement in loading or unloading, his scaffolding work “was an integral step in a maritime project of the type that could be performed by a typical harborworker,” and “directly furthered ... the loading and unloading of ships” by enabling the owner of the pier to perform its core longshoring operations. Id. at 756. Because a loading company would have otherwise had to provide for the repair of its piers, an employee engaged in that activity was covered *396 under the LHWCA even if he was employed as an independent contractor. See id. at 757-58.
II. Discussion
Juan Zepeda was not involved in the process of moving cargo between ship and land transportation. His task was to repair empty containers, some of which may have been used in maritime shipping. The now-vacated panel opinion nevertheless concluded that, because containers themselves are “integral” or “essential” to the loading process, the repair of such containers triggered application of the LHWCA. See Schwalb, 493 U.S. at 45, 110 S.Ct. 381 (“[L]and-based activity occurring within the § 903 situs will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel.”).
Although this conclusion is not an unreasonable interpretation of “integral” and “essential” as those words are understood on their own, the panel opinion as a whole divorces Schwalb and its predecessors from their roots. Schwalb stands for the proposition that employees who repair equipment used by longshoremen to load or unload vessels are just as essential to the loading process as the individuals who load or unload the cargo, because the actual process, once begun, would be arrested in the absence of their contributions. See id. at 48, 110 S.Ct. 381 (noting the “determinative consideration” was that the “ship loading process could not continue” in the absence of the repair). Because these workers repair the tools and instrumentalities that longshoremen rely on to execute their tasks, they are “engaged in the type of duties that longshoremen perform in transferring goods between ship and land transportation,” Ford, 444 U.S. at 81, 100 S.Ct. 328, and covered by the LHWCA.
On its own terms and against the backdrop of Caputo, Ford, and Herb’s Welding, Schwalb does not create a rule under which all employees who repair any equipment that may be used in the loading process are similarly integral. If this were the inquiry, it would only be a short step to the conclusion that a manufacturer of shoes or walkie talkies should be covered, because, arguably, the modern loading process cannot be accomplished without those items. But the LHWCA does not provide a but-for test for determining coverage. Instead, the statute looks to the customary maritime functions of dockworkers, albeit without an eye toward who is actually performing those functions. See Schwalb, 493 U.S. at 46, 110 S.Ct. 381; Ford, 444 U.S. at 81-82, 100 S.Ct. 328; Caputo, 432 U.S. at 273-74, 97 S.Ct. 2348. With this understanding, the proper question when defining the status of an employee under the LHWCA is whether the task that the employee engages in is the type of customary maritime work that a dockworker or longshoreman would have to perform in order to successfully transfer cargo between ship and land transportation. See Ford, 444 U.S. at 81, 100 S.Ct. 328.
This inquiry distinguishes tasks necessary to execute a loading process from the perspective of a longshoreman — such as repair of a longshoreman’s tools and facilities — from tasks that are only tangentially connected to the loading process. Construed broadly, the first category may capture a person whose sole responsibility is to sweep clear a loading ramp. It may even include someone who repairs broken dollies in between loading jobs. But it does not include, for example, a manufacturer of cardboard boxes. The way that cargo arrives at port may determine how the loading and unloading process is executed, but nothing about the production of the container is the customary job of a *397 harborworker or longshoreman.[2]
Although container repair is not customarily the task of longshoremen, courts have recognized that container repair satisfies the status test in some instances. For example, the Eleventh Circuit has held that container repair is “integral” or “essential” to the loading process when it “consistís] of making ... outbound, loaded chassis road worthy” and when, “[wjithout the essential maintenance necessary to make the outbound rigs road worthy, the unloading process would stop indefinitely at the Port Authority.” Atl. Container Serv., Inc. v. Coleman, 904 F.2d 611, 613, 618 (11th Cir.1990). In other words, container repair satisfies the status inquiry when it is one step in the direct chain of unloading a ship, and when “the maintenance men would [halt] the entire loading process” if they were not available for the repair. Sea-Land Serv., Inc. v. Rock, 953 F.2d 56, 67 (3d Cir.1992) (citing Coloma v. Dir., Office of Workers’ Comp. Programs, 897 F.2d 394, 400 (9th Cir.1990)); accord Schwalb, 493 U.S. at 48, 110 S.Ct. 381 (“The determinative consideration is that the ship loading process could not continue unless the retarder that Goode worked on was operating properly. It is notable that the loading actually was stopped while Goode made the repairs and that one of his supervisors apparently expressed the desire that Goode hurry up so that the loading could continue.”); Sidwell v. Va. Int’l Terminals, Inc., 372 F.3d 238, 243 (4th Cir.2004) (“This standard makes the capacity to interrupt ongoing longshoring activities paramount.”).
However, container repair does not satisfy this standard when it is not of the sort that is, or would have been, traditionally performed by longshoremen or har-borworkers. Zepeda’s work — the repair of empty containers that were neither headed for delivery nor toward a ship for transport, and indeed may well have been destined for a truck or train rather than a vessel — is clearly of this second character. This was not an instance in which the containers came off of a ship needing repair, and Zepeda was on hand to perform such repairs essential or necessary to ensure that the containers made it to their final destination. Nothing about Zepeda’s work was done with the purpose of assisting a longshoreman or harbor-worker execute his task, and nothing about the maritime nature of the location at which Zepeda worked, even if it was to be considered a proper situs, was functionally related to his repair work. In short, Zepeda’s work was not “essential” or “integral” to a longshoreman’s task of loading or unloading a vessel, because nothing about Zepeda’s work was part of the process of “moving cargo between ship and land transportation.” Herb’s Welding, 470 U.S. at 424, 105 S.Ct. 1421.
III. Conclusion
The LHWCA is to be “liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.” Caputo, 432 U.S. at 266, 97 S.Ct. 2348 (quoting Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953)). But incongruity is a two-sided inquiry. Zepeda, an individual who never loaded or unloaded a vessel, never assisted anyone else load or unload a vessel, and never witnessed a vessel being loaded or unloaded, is “a far cry from the paradigmatic longshoreman who walked in and out of coverage during his workday and spent substantial amounts of his time ‘on naviga *398 ble waters.’ ” Herb’s Welding, 470 U.S. at 427 n. 13, 105 S.Ct. 1421. Constructing the status inquiry so as to include Zepeda would make application of the Act unwieldy as to those who should be covered, and create a lack of uniformity between individuals such as Zepeda and similarly situated non-maritime employees who are limited to state compensation schemes. Under the precedent defining status established by this circuit and the Supreme Court, I would hold that Zepeda was not a maritime employee for purposes of the LHWCA while employed by NODSI.

. Prior to this en banc decision, the situs inquiry was often used to bolster and provide context for the status inquiry. The change in the nature of the situs inquiry provides an additional reason to clarify the proper formulation of the status inquiry.

. So stated, this distinction also avoids the red herring argument that what is ‘‘integral'' to the loading or unloading process depends on the size and financial capabilities of the entity supplying that product or service.