904 F.2d 611
 1990 A.M.C. 2905
 ATLANTIC CONTAINER SERVICE, INCORPORATED and U.S. Fidelity
and Guaranty Co., Employer/Carrier-Petitioners,
v.
Wallace COLEMAN, Claimant-Respondent,
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Benefits Review Board,
United States Department of Labor, Respondents.
 No. 89-8587.
 United States Court of Appeals,
Eleventh Circuit.
 June 27, 1990.
 
 Charles W. Barrow, Gustave R. Dubus, III, Savannah, Ga., for employer/carrier-petitioners.
 John Jeffrey Ross, U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for Dir., Office of Workers' Compensation, U.S. Dept. of Labor.
 Ralph R. Lorberbaum, Ashman & Zipperer, P.C., Savannah, Ga., for Coleman.
 Petition for Review of an Order of the Department of Labor Benefits Review Board.
 Before JOHNSON, Circuit Judge, HILL*, and HENLEY**, Senior Circuit Judges.
 HILL, Senior Circuit Judge:
 
 
 1
 This case concerns a claim for disability benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Secs. 901-950 (1982) ("the LHWCA"). The claimant, Wallace C. Coleman, asserts his entitlement to compensation under the LHWCA for a disability resulting from a back injury suffered on December 5, 1985. Coleman injured his back while changing a tire in the course of his employment with the Atlantic Container Service, Inc., ("Atlantic"), an appellant in this case. Atlantic denied the claim on grounds that Coleman's work did not qualify as maritime employment, and Coleman then brought his case to the appropriate administrative authorities.
 
 
 2
 A hearing regarding Coleman's claim was held before an Administrative Law Judge on September 16, 1986. The facts developed from that record demonstrate that Atlantic is in the business of maintaining and repairing equipment used to transport goods traveling from sea to land and back again. Such amphibious transport is referred to as the "intermodal trade." This case concerns two types of equipment used in the intermodal trade: containers and chassis.
 
 
 3
 Containers are essentially very large metal boxes which are used to store and transport cargo. While on board ship they serve to carry cargo. When the ship docks, the containers can be put to continued use in several different ways. Some are unloaded and emptied upon arrival, and the cargo sorted. Others are unloaded, then attached "as is" to a tractor/trailer, and hauled by land to their final destination. Or, the containers can be loaded directly onto railroad cars to continue their journey "piggy-back" style by rail.
 
 
 4
 A chassis is the wheeled support frame used to transport the container overland. In other words, a chassis is what most lay persons would call the "trailer" portion of a tractor/trailer rig, while the container is the load-carrying metal box that sits upon it.
 
 
 5
 As a mechanic for Atlantic, Coleman spent his work day making relatively minor repairs to chassis and containers at the Hapag Lloyd loading area of the Georgia Port Authority in Garden City, Georgia. At the time of his injury he worked exclusively on containers and chassis belonging to Hapag Lloyd Lines, a shipping company.
 
 
 6
 The loading area where Coleman worked is a large parking lot, approximately 500 yards from the Savannah River, on which numerous shipping and cargo companies park chassis and containers. Most of the containers parked in this lot have been taken off ships and loaded directly onto chassis. The chassis, carrying the containers, are then hauled up to the parking lot where Coleman worked. They are transported from dockside to the lot by tractor trucks called "hustlers." Hustlers are exactly like the tractor truck rigs used for overland transportation, except for the fact that they are not road worthy, i.e., they do not comply with the Department of Transportation standards for vehicles operating on public highways. Upon reaching the parking lot the container and chassis are unhitched from the hustler, and stay parked at the lot until picked up by a land based truck driver and his tractor rig for overland transport. In addition, at any given time the parking lot contains a number of empty inbound chassis/container rigs, which have been dropped off by truck drivers. These stay at the lot until hauled by the hustlers back down to the dock area for reloading.
 
 
 7
 Most of the work done by Coleman consisted of making the outbound, loaded chassis road worthy. He repaired tires, brakes, and lights. He also repaired doors on containers so that they could be opened properly. In addition, on rare occasions Coleman did repair work on hustlers. Although he was always available to do work on hustlers, this opportunity did not arise very often. Coleman also performed the necessary minor maintenance work on inbound chassis and containers, such as patching small holes in the empty containers or changing the tire on a chassis.
 
 
 8
 Coleman testified that 90% of his repair work involved getting containers and chassis ready to leave the Georgia Port Authority by making sure that all the equipment functioned in a manner consistent with Department of Transportation's standards for vehicles operating on public highways. Only five to ten percent of Coleman's maintenance work was done on chassis and containers dropped off by inbound truck drivers, or on hustlers.
 
 
 9
 Based on these facts, the Administrative Law Judge found that Coleman's work as a maintenance mechanic was "integrally related to the loading and unloading procedures, connected with and vital to the movement of maritime cargo on navigable waters," and he was therefore covered by the LHWCA. The judge concluded that Coleman's land-bound status did not preclude coverage under the LHWCA because "his repair duties facilitate the loading/unloading of cargo and, a fortiori, fall within the broad concept of maritime employment."
 
 
 10
 Atlantic and its insurer, United States Fidelity & Guaranty Corporation ("USF & G") appealed this decision to the Benefits Review Board. The Board upheld the administrative law judge's findings that Coleman was a covered employee. The Board found that "claimant's overall employment facilitates the movement of cargo between ship and land transportation and is maritime in nature." The Board also found that "Claimant's specific work on containers coming into the port to be put on ships and on equipment used solely to move cargo within the port area is directly integral to the loading and unloading process and, thus, is clearly covered employment." The Board concluded that since Coleman spent "at least some of his time on indisputably maritime activities," he was covered under the Act. Atlantic and USF & G now appeal the Board's decision to this court.
 
 
 11
 The LHWCA should be liberally construed in favor of injured workers and, in reviewing the Board's decision, an award should not be set aside so long as it is supported by substantial evidence on the record as a whole. Banks v. Chicago Grain Trimmers Ass'n., 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968); Presley v. Tinsley Maintenance Service, 529 F.2d 433, 436 (5th Cir.1976). While issues of statutory construction would not fall within the presumption of coverage mandated by the LHWCA, resolution of those issues by the Benefits Review Board should be affirmed if a reasonable legal basis supports the Board's decision. Alabama Dry Dock & Shipbuilding Co. v. Kininess, 554 F.2d 176 (5th Cir.) cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977).
 
 
 12
 The LHWCA provides a special scheme of federal compensation for maritime workers. As has been frequently discussed in many cases interpreting the LHWCA,[1] Congress amended the Act in 1972 in order to extend coverage to more workers by having a two-part "situs" and "status" standard for determining whether an employer was covered. Atlantic does not contest the fact that the situs test is met here.[2] The only issue appealed is whether Coleman meets the status test. This criterion defines a maritime employee as "any person engaged in maritime employment, including any longshoremen or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and ship breaker...." 33 U.S.C. Sec. 902(3).
 
 
 13
 The Supreme Court has interpreted the status requirement of the 1972 amendments three times in contexts relevant to this case. In Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), the Supreme Court determined that two different types of employees performing land based activities were covered under the LHWCA. The first operated as a "checker," the person responsible for checking and recording cargo as it was either loaded into a container or unloaded. The checker involved in Northeast was injured at the bonded warehouse where cargo was unloaded and awaiting inspection by U.S. Custom officials. The cargo had been taken to the warehouse from the pier by an independent overland trucking company, but not removed from the container until it reached the warehouse. A second employee, Caputto, had been injured while helping a consignee's truckmen load cargo that had been discharged from ships at the shipping company's terminal.
 
 
 14
 In determining that these employees were covered under the LHWCA, the Supreme Court explained that:
 
 
 15
 One of the primary motivations for Congress' decision to extend the coverage shoreward was the recognition that "the advent of modern cargo handling techniques" had moved much of the longshoremen's work off the vessel and onto land. S.Rep. 13; H.R.Rep. 10, U.S.Code Cong. & Admin.News 1972, p. 4707. Noted specifically was the impact of containerization. Unlike traditional break-bulk cargo handling, in which each item of cargo must be handled separately and stored individually in the hold of the ship as it waits in port, containerization permits the time consuming work of stowage and unstowage to be performed on land in the absence of the vessel ... In effect, the operation of loading and unloading has been moved shoreward; the container is a modern substitute for the hold of the vessel.
 
 
 16
 432 U.S. at 270, 97 S.Ct. at 2360. Under this theory, the Court found both men to be covered employees.
 
 
 17
 With respect to the second employee, injured while loading cargo onto a truck, the Court further explained:
 
 
 18
 Both the text and the history [of the Act] demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover "longshoremen," it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 amendments, would be covered for only part of their activity.
 
 
 19
 432 U.S. at 273, 97 S.Ct. at 2362. Finding that the worker who was injured while loading trucks on land could have been assigned, on any day, to unload a vessel at the pier, the Court determined that he was therefore covered under the LHWCA for his purely land-based activities.
 
 
 20
 In so deciding the Court rejected the argument that longshoring operations end when the cargo comes to a "point of rest." A term of art in the shipping industry, the "point of rest" denotes the place where the cargo first "rests" when it is taken out of the hold of the vessel, moved away from the ship's side, and carried to a point of rest on the pier or in a terminal shed. In loading operations, the point of rest is where an item is placed just before being loaded onto the ship. The shipping company argued that only persons handling cargo on the maritime side of the "point of rest" were covered by the LHWCA. The Court rejected this theory on grounds that, "coverage that stops at the point of rest excludes those engaged in loading and unloading the modern functional equivalents of the hold of the ship [containers]. As we have indicated, Congress clearly intended to cover such operations." 432 U.S. at 276, 97 S.Ct. at 2363.
 
 
 21
 The Supreme Court next considered the issue in P.C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). In Pfeiffer the Court determined that a worker who was injured while fastening military vehicles onto railroad flat cars, and another worker who was injured while unloading a bale of cotton from a dray wagon into a pier warehouse from which it would later be moved onto ships, were engaged in the type of land based activity encompassed by the term "maritime employment" for coverage under the LHWCA. In so deciding, the Court reviewed its decision in Northeast, and reemphasized its finding that the point of rest standard was inconsistent with Congressional intent. The Court reasoned that although it was a well-known term in the maritime industry it was not mentioned in the LHWCA or its legislative history, and the standard excluded from coverage employees whose work now took place on land by virtue of the use of containers. The Court also found the test invalid because it "conflicts with the express purpose of the Act because it allows workers to walk in and out of coverage as their work moves to different sides of the point of rest." 444 U.S. at 76, 100 S.Ct. at 333-34. Noting that the warehousemen who attached the military vehicles to a flatcar for transportation inland would indisputably have been covered had that action been taken as soon as the military vehicles were offloaded from the ship, the Court determined that subsequent transportation to a warehouse before attachment to the flatcar did not void coverage or make his occupation other than "maritime employment".
 
 The Court also stated:
 
 22
 Persons moving cargo directly from ship to land transportation are engaged in maritime employment.... A worker responsible for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process. We therefore hold that Ford and Bryant were engaged in maritime employment because they were engaged in intermediate steps of moving cargo between ship and land transportation.
 
 
 23
 444 U.S. at 82-83, 100 S.Ct. at 337.
 
 
 24
 The Supreme Court also made clear that it did not seek to impose a "time of injury" test by noting that the injured employees also engaged in nonmaritime duties. In a footnote, the Court stated:
 
 
 25
 Congress was especially concerned that some workers might walk in and walk out of coverage. Our observation that Ford and Bryant were engaged in maritime employment at the time of their injuries does not undermine the holding of Northeast Marine Terminal Co. v. Caputo, 432 U.S. at 273-274, 97 S.Ct. at 2362-2363 that a worker is covered if he spends some of his time in indisputably longshoring operations and if, without the 1972 Act, he would be only partially covered.
 
 
 26
 444 U.S. at 83 at n. 18, 100 S.Ct. at 337 n. 18.
 
 
 27
 The Supreme Court's most recent pronouncement on the status issue came well after the Benefit Review Board's decision was rendered in Coleman's case. In Chesapeake and Ohio Railway Co. v. Schwalb, --- U.S. ----, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989), the Court held that maintenance workers whose duties in part entailed cleaning and maintaining a conveyor belt system that transported coal from railway hopper cars to colliers berthed at the pier were covered under the LHWCA. The Supreme Court for the state of Virginia had determined that the employees were not covered because their activities did not bear a sufficiently "significant relationship" to the "essential elements" of loading and unloading. In reversing this decision, the United States Supreme Court rejected the "significant relationship" test, and held instead that maritime status may be conveyed upon land based activity only if it is "an integral or essential part of loading or unloading a vessel." 110 S.Ct. at 384. The Court noted that the employees in Schwalb were connected with the loading process "only by way of the repair and maintenance services that they were performing when they were injured," but that they nonetheless covered by the LHWCA because "employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes." 110 S.Ct. at 385.[3] The Court further stated,
 
 
 28
 Coverage is not limited to employees who are denominated "longshoremen" or who physically handle the cargo. Nor are maintenance employees removed from coverage if they also have duties not integrally connected with the loading or unloading functions. Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment. When machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured. It is irrelevant that an employee's contribution to the loading process is not continuous or that repair or maintenance is not always needed. Employees are surely covered when they are injured performing a task integral to loading a ship.
 
 
 29
 110 S.Ct. at 385.
 
 
 30
 On appeal, Atlantic and USF & G argue that maintenance work on the outbound chassis and containers does not qualify as maritime employment; they maintain that once the hustler is unhitched from the outbound chassis, the work done to make the chassis road worthy assists only the land-based transportation industry. At oral argument Atlantic did concede that Coleman's activities in repairing hustlers, inbound containers, and in repairing inbound chassis would, under Schwalb, qualify as indisputably maritime activities because the chassis, containers and hustlers must be in working condition in order for loading and unloading to take place at pierside. However, appellants argue that this portion of Coleman's activities constituted only 4% to 6% of his employment and that this is insufficient to confer maritime status. Alternatively, appellants suggest that the case be remanded to determine if Coleman was working on an inbound chassis when he was injured, arguing that Schwalb requires that a maintenance worker be performing a maritime activity at the time of his injury in order to be covered.
 
 
 31
 In reaching its decision, the Board relied in part on a case from our sister circuit, Boudlouche v. Howard Trucking Company, Inc., 632 F.2d 1346 (5th Cir. Unit A 1980), cert. denied, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). In Boudlouche, the Fifth Circuit specifically determined that an employee who spent only 2 1/2 to 5% of his overall working time performing the "full maritime function of a longshoreman" did meet the maritime status under Northeast, because that case defined longshoremen as "persons whose employment is such that they spend at least some of their time in indisputably longshoring operations." 632 F.2d at 1348.
 
 
 32
 However, the Board's decision did not rest solely on these narrow grounds. The decision concluded that:
 
 
 33
 Claimant's overall employment facilitates the movement of cargo between ship and land transportation and is maritime in nature ... In addition, claimant's specific work on containers coming into the port to be put on ships and on equipment used solely to move cargo within the port area is directly integral to the loading and unloading process and, thus, is clearly covered employment ... since claimant spends at least some of his time on indisputably maritime activities, he is a covered employee ... we cannot say that claimant's activities were so momentary or episodic as to place him outside the coverage of the Act."
 
 
 34
 The Board thus evidently determined that, overall, Coleman's maritime activities were essential to loading and unloading.
 
 
 35
 We find this conclusion to be legally and factually correct.[4] The Schwalb case makes clear that maritime status may be based upon land based activity only if it is "an integral or essential part of loading or unloading a vessel." 110 S.Ct. at 384.[5] Maintenance of the chassis in good working order is essential to prevent the loading and unloading process from breaking down. They must be kept in good condition to support the containers attached to them at dockside. They must be maintained in order to be hauled by hustlers as well as tractor trucks. Similarly, hustlers and containers, both of which Coleman worked on periodically, are essential to the loading and unloading process.
 
 
 36
 The fact Coleman worked primarily on making loaded chassis/container rigs road worthy does not diminish his involvement in the loading and unloading process. Without the essential maintenance necessary to make the outbound rigs road worthy, the unloading process would stop indefinitely at the Port Authority. Given the advent of containerization, making the chassis road worthy is the last step necessary to complete the unloading process such that the cargo is ready to leave its maritime existence and enter into the land based stream of commerce by being pulled out of the Port Authority area behind a tractor/trailer. To say that the unloading process is complete when the chassis is unhooked from the hustler merely reinvigorates the point of rest doctrine repeatedly rejected by the Supreme Court.
 
 
 37
 We find the Board's conclusion that Coleman's work was integrally related to the loading and unloading process to be legally correct and supported by substantial evidence. We therefore AFFIRM.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 See e.g., Northeast Marine Terminal Co. Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977)
 
 
 [2]
 The situs test provides compensation for "an employee" whose disability or death "results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, drydock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." Section 3(a), 33 U.S.C. Sec. 903(a)
 
 
 [3]
 The Supreme Court also noted that every federal appellate court to have addressed the maintenance issue had arrived at the same result. See e.g., Alabama Dry Dock and Shipbuilding Co. v. Kininess, 554 F.2d 176, 178 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) (Repair and maintenance of machines used in shipbuilding is an "essential aspect" of the shipbuilding business); Hullinghorst Industries, Inc. v. Carroll, 650 F.2d 750 (5th Cir. Unit A 1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982) (Employer who suffered back injury while erecting scaffolding beneath a pier in order to provide place for port facilities employees to stand in order to repair a turntable, a piece of equipment used in loading and unloading, constituted maritime employment and provided coverage under the Act); Sea-Land Services, Inc. v. Director, Office of Worker's Compensation Programs, 685 F.2d 1121, 1123 (9th Cir.1982) (per curiam) (worker who repaired forklifts and vehicles used to transport containers in shipyard is covered)
 
 
 [4]
 Given our conclusion that all of Coleman's employment activities were essentially maritime, we need not resolve the "substantiality" issue raised by the Boudlouche case or the "time of injury" argument. However, in the interest of clarifying the standard in this circuit, we note that many appellate cases prior to Schwalb interpreted Northeast and Pfeiffer to mean that "the moment of injury" test was no longer valid in determining the status of an employee under the LHWCA. See e.g., Garvey Grain Company v. Director, Office of Workers' Compensation Programs, 639 F.2d 366 (7th Cir.1981) (Noting that after Northeast and Pfeiffer, "the moment of injury test" is no longer the test to determine the status of an employee under the Act.) See also Sea-Land Services, Inc. v. Director of Workers' Compensation Programs, 685 F.2d 1121 (9th Cir.1982) (Repair and maintenance of equipment necessary to loading and unloading is integral to the process and is therefore maritime employment; in light of the Supreme Court's rejection of the theory that worker's activity at the moment of injury determines coverage under the Act, an employee is covered who clearly spent "at least some of [his] time in indisputably longshoremen's operations"). However, a former Fifth Circuit case, binding on this circuit by virtue of Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), held that a worker's maritime status could be established based upon "the maritime nature of the employment as a whole or upon the maritime nature of the claimant's activity at the time of the injury." Thibodaux v. Atlantic Richfield Co., 580 F.2d 841, 844 (5th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). This inherited test was repeated in two subsequent cases from this circuit, Hullinghorst Industries, Inc., 650 F.2d 750, 752 (5th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982), and Browning v. B.F. Diamond Construction Co., 676 F.2d 547 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983), without reference to the Supreme Court's intervening dicta in Northeast and Pfeiffer, and it is this test that appellants sought to apply
 Schwalb does not say that any maintenance employee injured while not working on loading equipment would not be covered. The majority opinion simply does not discuss that aspect of Northeast and Pfeiffer. On the other hand, the concurring opinion in Schwalb specifically notes that in light of Northeast, "it is not essential to our holding that the employees were injured when actually engaged in these tasks. They are covered by LHWCA even if, at the moment of injury, they had been performing other work that was not essential to the loading process." 110 S.Ct. at 386. The concurring justices, Blackmun, Marshall and O'Connor, maintained that "In Pfeiffer, we said that the 'crucial factor' in determining LHWCA coverage is the nature of the activity to which a worker may be assigned." (emphasis in original). The concurring justices reasoned:
 To suggest that a worker like Schwalb, McGlone, or Goode, who spends part of his time maintaining or repairing loading equipment, and part of his time on other tasks (even general cleanup, or repair of equipment not used for loading), is covered only if he is injured while engaged in the former kind of work, would bring the "walking in and out of coverage" problem back with a vengeance. We said in Northeast Marine Terminal Co., that "to exclude [a worker] from the Act's coverage in the morning but include him in the afternoon would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate." 432 U.S. at 274, 97 S.Ct. at 2362-2363.
 
 
 [110]
 S.Ct. at 387. Given the conflicting views on the "time of injury" component of the status test we will go so far as to note that the language and holding of the majority in Schwalb is consistent with the test applied in Hullinghorst and Browning. But for this digression, we save resolution of the "time of injury" conundrum for another day, as the issue is not essential to the outcome of this case
 
 
 [5]
 As noted supra at footnote 4, we conclude that this standard does not conflict with the standard espoused in Hullinghorst Industries, Inc., 650 F.2d 750, 752 (5th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982), or Browning v. B.F. Diamond Construction Co., 676 F.2d 547 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). However, as the latest pronouncement from the Supreme Court, the Schwalb test supersedes any differing standard previously used by this court, such as whether an employee's responsibilities have a "significant relationship" to the maritime concerns of his employer. See e.g. Sanders v. Alabama Dry Dock & Shipbuilding Co., 841 F.2d 1085 (11th Cir.1988) (labor relations assistant covered because his activities had a "significant relationship" to employer's shipyard activities); see also Odom Constr. Co. v. United States Dept. of Labor, 622 F.2d 110 (5th Cir.1980), cert. denied, 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981) (construction worker injured while removing concrete blocks from canal covered because his activity significantly "furthered maritime commerce"). The standards applied in both Odom and Sanders approximate the "significant relationship" test rejected by the Supreme Court in Schwalb