CARL E. STEWART, Circuit Judge:
Before the court is a petition for review from a decision of the Benefits Review Board (“BRB”) affirming an award of workers’ compensation benefits for which Petitioner New Orleans Depot Services, Incorporated (“NODSI”) was found liable. As there is substantial evidence to support the factual findings of the Administrative Law Judge (“ALJ”), we deny the petition for review.
I.
Claimant Juan Zepeda was employed by NODSI as a container repair mechanic from 1996 until 2002, when he quit because of a bone spur injury. Pri- or to his employment with NODSI, Zepeda performed container and chassis[1] maintenance for Respondent New Orleans Marine Contractors (“NOMC”) for approximately five months. During his employment with both NODSI and NOMC, Zepeda was exposed to loud nois *404 es on a continuous basis and did not use hearing protection. Zepeda now suffers from an 11.3 percent binaural hearing impairment, for which he sought permanent partial disability benefits under the Long-shore and Harbor Workers’ Compensation Act (“LHWCA” or “the Act”).[2]
At his formal hearing before the ALJ, Zepeda testified that he performed work for NODSI at two separate yards: the Chef Yard, which is approximately 300 yards from the Industrial Canal, and the Terminal Yard, which is approximately 100 yards from the waterfront. These yards do not have any docks, piers, or wharfs. At the Chef Yard, Zepeda worked predominately on Evergreen containers. Zepeda testified that he was never informed where the containers and chassis had been prior to having been brought to the yard for maintenance. Zepeda was a member of the International Longshoremen’s Association (“ILA”) throughout his employment with NOMC. He was also a member of ILA during his time with NODSI, but switched to non-union employment at some point while so employed.
Kirk Williams, the owner of NODSI, testified that he started the company in 1996. NODSI was initiated primarily to serve the container needs of Evergreen, a company specializing in the transportation of oceangoing cargo in a fully containerized atmosphere. NODSI serviced Evergreen exclusively until 2002, when it also contracted with Mitsui O.S.K. for similar services. Williams testified that Evergreen did not request that NODSI be set up in a specific location. Williams further testified that he selected the location for the Chef Yard because of the hard land, and did not consider access to a waterway. The Terminal Yard was acquired through a lease with the Board of Commissioners for the Port of New Orleans. Williams testified that access to a waterway was not a consideration in the selection of the Terminal Yard site.
Zepeda’s son, a terminal supervisor for NODSI, testified in his deposition that the containers to be repaired are rarely labeled to identify which customer owns the containers. He stated that he would not know whether the containers came into the Port of New Orleans by ship. He also testified that Zepeda performed most of his work in the Chef Yard, which had more than 1,000 containers going in and out of the yard each year.
Thomas Brooks, a claims adjuster hired by Ports America, the successor of NOMC, testified regarding the composition of the area surrounding both yards. By his account, there are several trucking and industrial yards, a coffee roasting plant, several marine facilities, and terminals near the Chef Yard. Near the Terminal Yard, there are tank storage facilities and a trucking facility with large marine containers.
Dominic Obrigkeit, senior vice-president of the international business division of Evergreen, was deposed. He testified that Evergreen’s oceangoing containers would enter and exit the Port of New Orleans on ships owned by Lykes, pursu *405 ant to a share-space agreement. Evergreen maintained an office in New Orleans to allow for oversight of the day-today transfer of containers through the Port of New Orleans. Damaged containers would be sent to local contractors near the offload site for repairs. Pursuant to a master contract with the ILA, local contractors were required to have ILA labor employees at their facilities to make repairs to Evergreen containers. Obrigkeit was not aware of any division of ship and rail containers at local contractors.
The ALJ determined that NODSI was liable for Zepeda’s benefits as his last maritime employer. The ALJ found that Zepeda, an ILA union employee, worked exclusively on Evergreen containers until 2002. He further found that Evergreen employed local contractors for repairs of containers used in both rail and marine shipping. Accordingly, as Zepeda solely repaired Evergreen containers, the ALJ concluded that he repaired marine containers at least some of the time during his employment -with NODSI, thus satisfying the maritime status requirement. Additionally, the ALJ determined that both the Chef Yard and Terminal Yard satisfy the geographical nexus of the situs requirement. The ALJ also determined that the Chef Yard satisfies the functional nexus component of the maritime situs requirement; Therefore, the ALJ determined that Zepeda’s injury occasioned during his employment with NODSI was covered by the LHWCA.
On December 3, 2010, the BRB affirmed the ALJ’s decision. Thereafter, NODSI brought the instant petition for review of the BRB’s decision.
II.
“Our review of Review Board decisions is limited to considering errors of law and ensuring that the Review Board adhered to its statutory standard of review, that is, whether the ALJ’s findings of fact are supported by substantial evidence and are consistent with the law.” Sisson v. Davis & Sons, Inc., 131 F.3d 555, 557 (5th Cir.1998). “Substantial evidence is that relevant evidence — more than a scintilla but less than a preponderance — that would cause a reasonable person to accept the fact finding.” Coastal Prod. Servs. Inc. v. Hudson, 555 F.3d 426, 430 (5th Cir.2009) (internal quotation marks omitted). We review the BRB’s legal conclusions de novo. Id.
“Although perhaps somewhat quizzical in light of the typical understanding of the difference between conclusions of law and findings of fact, we decided in Texports Stevedore Co. v. Winchester that the determination of situs by the ALJ is one of fact.” Id. (citing 632 F.2d 504, 515 (5th Cir.1980) (en banc)). “Status determinations are also findings of fact, unless made under an erroneous legal standard.” Id. at 430-31. “[T]he ALJ’s selection of reasonable conflicting factual inferences is conclusive ... if supported by the evidence and not inconsistent with the law.” Hullinghorst Indus., Inc. v. Carroll, 650 F.2d 750, 753 (5th Cir.1981). “This Court may not substitute our judgment for that of the ALJ, nor reweigh or reappraise the evidence, but may only determine whether evidence exists to support the ALJ’s findings.” Cooper/T. Smith Stevedoring Co. v. Liuzza, 293 F.3d 741, 745 (5th Cir.2002) (internal quotation marks omitted).[3]
*406 III.
The LHWCA is a federal workers’ compensation scheme for the benefit of maritime workers. “Prior to 1972, the Act applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship.” Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 46, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989). To obviate this inequitable result, Congress broadened the coverage to embrace maritime activities on land near the water.
“The Supreme Court has cautioned that we must ‘take an expansive view of the extended coverage’ of the LHWCA.” Sisson, 131 F.3d at 557 (quoting Ne. Marine Terminal Co. v. Caputo, 432 U.S. 249, 268, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977)) (emphasis added). “The Act should be liberally construed in favor of injured workers, ‘in conformance with its purpose, and in a way that avoids harsh and incongruous results.’ ” Winchester, 632 F.2d at 515 (quoting Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953)). There is a “presumption of coverage.” Id. at 508.
“For a claimant to be eligible for benefits under the LHWCA (1) his injury must occur on a maritime situs, and (2) his status must be that of a maritime employee. Both requirements must be met for the claimant to receive benefits under the Act.” Hudson, 555 F.3d at 431.
The situs requirement derives from 33 U.S.C. § 903, which states:
Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).
33 U.S.C. § 903(a).
The status requirement derives from 33 U.S.C. § 902, which provides that “[t]he term ‘employee’ means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker .... ” 33 U.S.C. § 902(3).
In this case, NODSI objects to the ALJ’s factual findings that the Chef Yard is a maritime situs and that Zepeda is a maritime employee for purposes of the LHWCA.
A. Situs
As Zepeda’s injury from his employment with NODSI was not incurred on navigable waters, liability may be imposed on NODSI only if its facility constitutes an “other adjoining area,” pursuant to 33 U.S.C. § 903(a). In this circuit, when deciding whether a location satisfies the situs component of LHWCA coverage, courts consider both the geographic proximity to the water’s edge and the functional relationship of the location to maritime activity. Winchester, 632 F.2d at 514-15 (“So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee’s injury can come within the LHW[C]A .... The perimeter of an area is defined by function.”]. NODSI has conceded that the Chef Yard satisfies the geographic proximity requirement of the situs inquiry; accordingly, its sole challenge to the ALJ’s finding that the Chef *407 Yard is a covered situs is that the location lacks the functional relationship to maritime activity required by the LHWCA.
“The statute does not require that the area’s exclusive use be for maritime purposes so long as it is customarily used for significant maritime activity.” Id. at 515. “The situs need not be used ... even primarily for maritime purposes ....” Hudson, 555 F.3d at 433.
[S]imply because a vessel cannot dock for loading and unloading at a particular area does not mean that the area is not a covered situs .... [I]f a particular area is associated with items used as part of the loading process, the area need not itself be directly involved in loading or unloading a vessel or physically connected to the point of loading or unloading.
Id. at 434 (emphasis added). “The character of surrounding properties is but one factor to be considered in determining whether a site is an ‘adjoining area’ under the LHW[C]A.” Winchester, 632 F.2d at 513.
“[T]he LHWCA is to be construed liberally in favor of compensation.” Hudson, 555 F.3d at 437. “A broad interpretation of the maritime situs requirement reduces the number of workers walking in and out of coverage and promotes uniformity.” Winchester, 632 F.2d at 516. “If the situs determination is supported by substantial evidence on the record as a whole, it will not be set aside by this court.” Id. at 515.
In this case, the ALJ relied on several items of evidence in reaching his determination that the Chef Yard is a maritime situs. The ALJ found that, regardless of NODSI’s employees’ awareness of such, some of the Evergreen containers repaired by NODSI were used for marine transportation and were offloaded at the Port of New Orleans. NODSI initially only serviced Evergreen containers, and was required, pursuant to Evergreen’s labor contract, to hire unionized maritime workers, including Zepeda. Accordingly, the ALJ determined that the functional nexus requirement was satisfied because Evergreen’s marine containers, which were used for marine transportation or had previously been used in marine transportation, were stored and repaired at the Chef Yard. In addition to the evidence explicitly relied upon by the ALJ as the basis for his decision, our independent review of the record has identified other evidence supportive of the maritime situs determination, notably the testimony of Brooks, a claims adjustor, acknowledging the presence of marine facilities in the area surrounding the Chef yard. Applying the deferential standard of review required by Winchester, it is clear that the ALJ’s situs determination is supported by substantial evidence in the record as a whole.[4]
In opposition, NODSI relies in large part on the Ninth Circuit’s decision in *408 Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137 (9th Cir.1978), which has subsequently been interpreted in that circuit as having set out specific factors to be considered when determining whether an adjoining area bears a sufficient functional relationship to a waterway so as to be rendered a maritime situs. See Motoviloff v. Dir., Office of Workers’ Comp. Programs, 692 F.2d 87, 89 (9th Cir.1982) (“Among factors to be considered in determining such relationship are (1) the particular suitability of the site for maritime uses; (2) whether adjoining properties are devoted primarily to uses in maritime commerce; (3) the proximity to the waterway; and (4) whether the adjoining site is as close to the waterway as feasible.”).
For a couple of reasons, the analogous cases from the Ninth Circuit do not determine our result here. First, in Winchester, an en banc decision, this court rejected the application of a formulaic factor test for resolving situs issues under the LHWCA. See Winchester, 632 F.2d at 513-14 (“Just as we disapprove of a test that disposes of the question based totally on the presence or absence of intervening or surrounding maritime facilities, we also reject the idea that Congress intended to substitute for the shoreline another hard line .... All circumstances must be examined.”). Additionally, though it appears that the Ninth Circuit applies the same deferential standard of review mandated in this circuit by Winchester;[5] the posture of Motoviloff, the single Ninth Circuit case cited by NODSI holding that an employer’s facility is not a maritime situs, is appreciably different from that of the present case in one notable respect: in Motoviloff, the ALJ denied the claim for benefits and the BRB affirmed the denial; whereas, in the present case, the ALJ held NODSI liable for Zepeda’s benefits and the BRB affirmed this decision.
Given this circuit’s deferential review of an ALJ’s factual situs determination, we conclude that there is substantial evidence in the record to support the ALJ’s factual determination that the Chef Yard is a maritime situs under the LHWCA.
B. Status
The second part of the coverage analysis asks whether the claimant is a maritime employee as defined by the LHWCA.
Although the Act does not define “maritime employment,” the Supreme Court has instructed that occupations in addition to those enumerated in the statute will be covered as maritime employment if the occupation entails activities that are an integral or essential part of the loading, unloading, building, or repairing of a vessel. In addition, the employee’s maritime activities must be more than episodic, momentary, or incidental to his non-maritime work.
Hudson, 555 F.3d at 439.
In Schwalb, the Supreme Court ruled that workers who performed maintenance and repairs on land to a mechanical conveyor-belt system which transported coal to a loading tower from which it is poured into the hold of a ship were maritime employees pursuant to the LHWCA. The Court stated the following:
[Ejmployees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes .... Someone who repairs or maintains a piece of loading equipment is just as vital to and an *409 integral part of the loading process as the operator of the equipment.
Schwalb, 493 U.S. at 47, 110 S.Ct. 381 (emphasis added). Likewise, “[t]his court has made it clear that the maintenance and repair of tools, equipment, and facilities used in indisputably maritime activities lies within the scope of ‘maritime employment’ as that term is used in the Act.” Carroll, 650 F.2d at 755. “We have ... upheld maritime status for an employee who spent only 2.5-5% of his employment engaged in maritime activities when those activities were part of his regularly assigned duties ....” Hudson, 555 F.3d at 441.
“That the skills utilized by [the claimant] were ‘essentially nonmaritime’ in character is immaterial. It is the purpose of the work that is the key; ‘nonmaritime’ skills applied to a maritime project are maritime for purposes of the ‘maritime employment’ test of the Act.” Carroll, 650 F.2d at 756,
Although this court has not previously addressed the scope of maritime employment under the LHWCA in the context of container repair, the Eleventh Circuit addressed this scenario in Atlantic Container Service, Inc. v. Coleman, 904 F.2d 611 (11th Cir.1990), which ruled that an employer was liable under the Act for a claimant’s back injury incurred while working on chassis and containers owned by a shipping company. The court reasoned that, as in Schwalb, container repair was an integral part of the loading process. See Coleman, 904 F.2d at 618 (“[C]ontainers, ... which [the claimant] worked on periodically, are essential to the loading and unloading process.”).[6]
In the present case, the ALJ determined that Zepeda engaged in maritime employment because, as an ILA employee, he worked on Evergreen marine shipping containers. Testimony revealed that the containers came into the Port of New Orleans aboard ships, and were sent to local contractors for repair. Zepeda worked a portion of his employment with NODSI solely on Evergreen containers and, therefore, repaired marine shipping containers at least some of the time. The ALJ considered marine container repair an essential function of the loading and unloading process.
The ALJ’s reasoning in this case is consistent with our case law. Accordingly, the ALJ’s factual determination with respect to maritime status is entitled to deferential review for substantial evidence in the record. We conclude that there is sufficient evidence in the record to support the ALJ’s factual finding that Zepeda, while employed by NODSI, was a mari *410 time employee for purposes of the LHWCA.
IV.
For the foregoing reasons, we determine that there is substantial evidence in the record to support the ALJ’s factual determinations and the BRB’s decision to affirm. Accordingly, the petition for review is DENIED.

. "[A] chassis is what most lay persons would call the ‘trailer’ portion of a tractor/trailer rig, while the container is the load-carrying metal box that sits upon it.” Atl. Container Serv., Inc. v. Coleman, 904 F.2d 611, 612 (11th Cir. 1990).

. It is undisputed that Zepeda was an employee covered under the Act while working for NOMC. Pursuant to the “last employer rule” which applies to claims involving noise-induced hearing loss, the employer during the last covered employment in which the claimant was exposed to injurious stimuli is liable for the full amount of the benefits award. Avondale Indus., Inc. v. Dir., Office of Workers' Comp. Programs, 977 F.2d 186, 189 (5th Cir. 1992). Accordingly, if it is established that Zepeda was covered under the LHWCA during his subsequent employment with NODSI, NODSI will be liable for the full amount of his benefits although Zepeda was exposed to injurious stimuli during his months of employment with NOMC.

. We note that the dissenting opinion, while concluding that the ALJ’s decision should be overturned, ignores the deferential standard of review for factual findings required by our precedents and instead seeks to frame the dispositive issues in this case as legal rather than factual ones.

. The dissent asserts that the functional nexus test cannot be satisfied in this case because marine shipping containers, which were stored and repaired at the Chef Yard, are “loaded” and, therefore, categorically are not "items used as part of the loading process.” This narrow distinction finds no support in the language of the LHWCA, is contrary to the broad construction of the statute required by our applicable precedents, and ignores our fundamental deferential review of the ALJ’s factual determinations. The question before us is not whether we would have reached the same factual conclusion in the first instance; rather, we must determine whether there is more than a scintilla of evidence in the record to support the ALJ’s factual finding. For all of the reasons enumerated above, it is clear that there is sufficient evidence establishing that the Chef Yard is “associated with items used as part of the loading process ...." Hudson, 555 F.3d at 434 (emphasis added). Accordingly, the ALJ’s situs determination must be affirmed.

. See Herron, 568 F.2d at 140 n. 2 ("[T]lie[ ] findings [of the ALJ] are controlling if supported by substantial evidence in the record considered as a whole.”).

. We note that the dissent’s interpretation of the LHWCA, according to which the repair of shipping containers used in maritime transport is not maritime activity within the purview of the statute, would create a circuit split. See Alfaro v. Commissioner, 349 F.3d 225, 229 (5th Cir.2003) ("We are always chary to create a circuit split.”). According to our precedents, circuit splits should be avoided unless persuasive reasons exists for creating them. See United States v. Adam, 296 F.3d 327, 332 (5th Cir.2002); Carranza-De Salinas v. Gonzales, 477 F.3d 200, 208 (5th Cir.2007). In our view, the dissent’s attempt to distinguish a carpenter’s construction of scaffolding, to be used by others, beneath a pier, which we concluded was maritime employment in Carroll, from the employment at issue in the present case is unpersuasive. It is clear that the repair of marine shipping containers constitutes the "repair of tools, equipment, and facilities used in indisputably maritime activities ....” Carroll, 650 F.2d at 755 (emphasis added). This conclusion is reinforced by the fact that Evergreen, an international shipping company, once employed NODSI as its sole contractor for the repair of oceangoing containers which had entered the Port of New Orleans.