## CIRCUIT COURT OF THE CITY OF NORFOLK

Gilbert Bynum

v.

Norfolk Southern Ry. Co.

September 25, 2014

Case No. CL13-4394

By Judge Mary Jane Hall

Gilbert Bynum, a brakeman employed by Defendant Norfolk Southern Railway Co., resists application of the exclusivity provision in the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* ("LHWCA"), and asks this Court to overrule Defendant's Plea in Bar to his action for damages under the Federal Employers Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA"). Some of his arguments in support of preserving a railroad worker's right to bring an FELA action are compelling and would deserve favorable reception if this were a case of first impression; but this Court must respect and follow the course of decisions from federal courts that have applied and interpreted the LHWCA. Application of settled case law mandates that Defendant's Plea in Bar be sustained.

### Factual Background and Procedural History

Bynum suffered an injury on November 22, 2010, at the Lambert's Point Coal Terminal, where he worked as a brakeman for Norfolk Southern. He applied for and received federal workers' compensation benefits under the LHWCA. Thereafter, on May 29, 2013, he filed the instant action under FELA, which provides railroad employees with a right to recover for injuries caused by the negligence of the railroad.

Norfolk Southern removed the litigation to federal court on July 3, 2013, asserting the LHWCA covered his injury and barred his recovery under FELA. It argued that only a federal court could resolve that issue.

The federal court granted Bynum's motion to remand the matter to state court. Norfolk Southern appealed that remand and filed a mandamus petition asking the federal appellate court to vacate the district court's order and dismiss the case or, alternately, to order the district court to address the merits of its defense to the FELA claim. This Court, which received the case back from federal court on August 14, 2013, granted a stay pending the outcome of the litigation in the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit concluded that it lacked jurisdiction to review the district court's order on appeal. It dismissed the appeal and denied mandamus relief. The stay in this Court was lifted, and the parties proceeded to brief and argue Defendant's Special Plea in Bar, filed on August 22, 2013.

The Court conducted an evidentiary hearing on September 11, 2014, and heard a detailed description of the process by which loaded coal cars arriving at Lambert's Point Terminal are emptied and the coal loaded onto ocean-going vessels. *See* Transcript of Oral Argument, *Bynum v. Norfolk Southern* (2014) (CL13-4394) ("Tr."). A number of reported decisions involving injuries at Lambert's Point have also included brief descriptions of this very process: *see, e.g., Bynum v. Norfolk Southern Ry.*, 2014 U.S. App. LEXIS 11749 (4th Cir. 2014); *Goode v. Norfolk & Western Ry.*, 10 Va. Cir. 69 (Norfolk 1986); *Schwalb v. Chesapeake & Ohio Ry.*, 235 Va. 27 (1988); *Etheridge v. Norfolk & Western Ry.*, 9 F.3d 1087 (4th Cir. 1993). *White v. Norfolk & Western Ry.*, 217 Va. 823 (1977). All of these descriptions of the coal-loading process differ somewhat. The Court has noted all of them but makes its own factual findings based on the evidence presented by Pier Master Austin, who testified at the hearing. Before being unloaded, railroad cars filled with coal are staged in an elevated area of tracks known as the Barney Yard. *Tr.* at 36-37. Bynum's job as a brakeman and control operator required that he receive via radio his instructions as to which car to release and then release the brake on the designated car as instructed. *Tr.* at 6, 32, 42-43. The thirty-two tracks in the Barney Yard merge into two tracks at its base. *Tr.* at 12, 38, 39. Once released, a car rolls down the sloped track equipped with retarders, which squeeze the wheels of the car to slow it down, and through one of the two thawing sheds, where a car containing frozen coal may be stopped and heated as long as necessary to facilitate ease of dumping later. *Tr.* at 40-41, 49.

Beyond the thawing sheds, the car rolls again on tracks equipped with retarders, as it rolls toward scales that weigh the cargo. *Tr.* at 22-23. After being weighed, the car rolls into an area called the Barney Pit and stops via retarders in a process controlled by an employee known as the Car Retarder Operator. *Tr.* at 23-25, 46-48. He and an employee known as the Pusher Operator stage the car, *i.e.*, get it in place to attach to a narrow locomotive device housed between the railroad tracks known as a "Barney Mule." *Tr.* at 45, 48. When the car is appropriately staged in the Barney Pit, a green

light is illuminated. *Tr.* at 56-57. The employee who operates the dumper, appropriately titled the Dumper Operator, then activates the Barney Mule to engage with the car and push it up an incline into a rotary dumper. *Tr.* at 27, 28-29, 51-53. The dumper rotates the car upside down, spilling the coal into hopper bins beneath. *Tr.* at 58. The bins feed the dumped coal onto a series of wide conveyor belts directly to one of two massive ship loaders which actually deliver coal into the holds of the vessels at the pier. *Tr.* at 27, 30, 58-60.

The process described above is run by two types of railroad laborers: Train and Engine Service, or T&E, employees; and mechanical employees. *Tr.* at 53. Employees who work in the yard, including Plaintiff, are T&E employees; mechanical employees operate the pusher and the dumper and the loader. *Tr.* at 53-54. The two groups belong to separate unions with different collective bargaining agreements and attend separate safety meetings. *Tr.* at 54-55. Job responsibilities undertaken by one type of employee may not be performed by the other. *Tr.* at 55-56.

## Legal Analysis

### A. *Expansion of the LHWCA To Include Non-Longshoremen, Including Railroad Workers*

Since the 1972 amendments to the LHWCA, coverage under the statute is determined by two basic tests: a situs test, focusing on the place where the injury occurred, and a status test, focusing on the character of the injured employee's occupation. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264-65 (1977). The new situs definition expanded coverage to injuries that occurred shoreward of what had been known as the "*Jensen* line" to include areas adjacent to navigable waters such as the terminal involved in the case at bar.

The Supreme Court created the *Jensen* line in *Southern Pac. Co. v. Jensen*, 244 U.S. 205 (1917), where it held that federal admiralty or maritime law provides exclusive remedies for injuries occurring on a gangplank between a ship and a pier, preempting state workers' compensation laws. Such injuries occurring seaward of the *Jensen* line were covered by the LHWCA, while injuries occurring shoreward of the line were covered by other statutes. When Congress amended the LHWCA in 1972, it moved the *Jensen* line shoreward from navigable waters to include adjoining areas.

The requisite occupational status is defined in the Act at 33 U.S.C. § 902:

> The term "employee" *means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but*

> *such term* does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

33 U.S.C. § 902(3) (emphasis added).

In his review of the evolution of the LHWCA and the 1972 amendments, Bynum argues that the statute was never intended to apply to railroad workers. Justice Stevens made a similar argument in a forceful dissent that carefully reviewed the statutory language and legislative history of the 1972 LHWCA amendments. In *Director, Office of Workers' Compensation Programs v. Perini North River Associates*, 459 U.S. 297 (1983), the claimant suffered injury while constructing the foundation of a sewage treatment plant that extended 700 feet into the Hudson River. The dissent strongly resisted expanding the Act to a worker who was obviously neither a longshoreman nor a harbor worker:

> If we ignore history, and merely concentrate on the text of this statute, the conclusion is inescapable that it merely provides coverage for people who do the work of longshoremen and harbor workers — amphibious persons who are directly involved in moving freight onto and off ships, or in building, repairing, or destroying ships. A "checker" is such a worker. So are "terminal laborers," *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249 (1977), "cotton headers," *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69 (1979), and "warehousemen," *ibid.* A construction worker on a sewage treatment plant plainly lacks this direct link to maritime commerce, regardless of where he may have been working at the time of his injury.

> If we examine the legislative history of the 1972 Amendment — without regard to the text of the statute or judicial decisions that are unmentioned in that history — we must reach the same conclusion. *I cannot find a single word in the Committee hearings, the Committee Reports, or the legislative debates that even suggests that any Congressman or Senator believed that the statute provided coverage for anyone other than longshoremen, harbor workers, and persons in the entirely separate categories that had been included by special statutory enactment.*

*Id.* at 328-30 (emphasis added). Justice Stevens concluded:

> In this case, the statutory language plainly encompasses longshoremen and harbor workers; there is no affirmative evidence of a legislative intent to provide coverage for any other type of occupation. Surely there is no evidence of an

> intent to classify the work of a janitor or a builder of sewage treatment plants as "maritime employment." Because the claimant in this case was neither a longshoreman nor a harbor worker, I would affirm the judgment of the United States Court of Appeals for the Second Circuit.

*Id.* at 342-43.

The Supreme Court of Virginia had, five years earlier, engaged in its own analysis of the statute and the legislative history and similarly rejected an expanded interpretation of the maritime employment test. *White v. Norfolk & Western Ry.*, 217 Va. 823 (1977) (railroad electrician had not been converted into a maritime worker merely because injury happened while he worked in a ship loader).

Justice Stevens' view remains a minority view, and Congress has taken no action to correct the ongoing expansion of LHWCA coverage to employees whose duties fall outside the traditional work of longshoremen and harbor workers. Bynum's attack on the application of the LHWCA to railroad workers is supported by *White* and the dissent in *Perini*, but neither of these decisions state the law of the land. Those litigants and judges who have advanced the view that Congress never intended to extend LHWCA benefits to occupations other than longshoremen and harbor workers have failed to persuade the U.S. Supreme Court or Congress.

### B. *Characterizing Bynum's Brakeman Activities as "Maritime Employment"*

The LHWCA only bars Bynum from pursuing his FELA claim if he was engaged in maritime employment at his job at Lambert's Point. Bynum's land-based work is not one of the specific occupations named in § 902(3) and, therefore, constitutes "maritime employment" within the meaning of the LHWCA only if his activity is an integral part of and essential to the loading or unloading processes. *Chesapeake & O. Ry. v. Schwalb*, 493 U.S. 40, 46-47 (1989).

Counsel for Plaintiff vigorously asserts that Bynum's work as a brakeman and switch operator, moving cars around the yard as he would in any rail yard, does not constitute maritime employment. He urges the Court to find that the activities integral and essential to the vessel-loading process commenced not while cars were being staged and released in the Barney Yard but rather, no earlier than when the Dumper Operator takes control of the car and initiates its ascent into the rotary dumper, where the coal is actually dumped from the car to begin its conveyor belt journey toward the vessel.

Counsel's argument would appear to be contradicted by the following statement in the second paragraph of the *Schwalb* opinion:

> At the C. & O. facility, a mechanical conveyor-belt system transports coal from railroad hopper cars to colliers berthed at the piers. *The loading process begins when a hopper car is rolled down an incline to a mechanical dumper which is activated by trunnion rollers and which dumps the coal through a hopper onto conveyor belts.*

493 U.S. at 43.

That *Schwalb* narrative described a C & O Railway terminal in Newport News, not Lambert's Point in Norfolk; and the description differs from the Lambert's Point process described in testimony offered in this Court. A hopper car does not "roll down an incline to a mechanical dumper" in Lambert's Point; it is propelled *up* an incline by the Barney Mule to the mechanical dumper. Nonetheless, two federal circuit courts have seized upon that *Schwalb* language as their points for deciding cases involving injury at the Lambert's Point terminal.

In *Etheridge v. Norfolk & Western Ry.*, 9 F.3d 1087 (4th Cir. 1993), the plaintiff worked as a brakeman at Lambert's Point, doing the same job as Bynum. She released the brake on a car staged in the Barney Yard, which did not then roll freely as it should have. She used a "pinch bar" to prod the car along down the slope and was injured in the process. *Id.* at 1089. The Court based its decision on the *Schwalb* description of the Newport News terminal:

> Describing the Virginia facility addressed in *Schwalb*, which is virtually identical in pertinent respects to the Lambert's Point terminal, the Court stated, *"The loading process begins when a hopper car is rolled down an incline to a mechanical dumper which . . . dumps the coal through a hopper onto conveyor belts."* We believe that this statement makes plain that a brake person in the Barney Yard, who initiates the descent of railroad cars to the pier, begins the loading process and, therefore, engages in employment that is essential to the loading process.

*Etheridge*, 9 F.3d at 1090 (emphasis in original). The *Etheridge* Court did not engage in its own analysis of the loading process but recited undisputed facts and relied upon what it took to be the holding of *Schwalb* regarding the beginning of that process in another terminal. It gave no explanation to support the conclusion that the Newport News and Norfolk terminals are "virtually identical;" the Court does not refer to any evidence that the district court received regarding the similarities or differences between the two. The district court opinion, *Etheridge v. Norfolk & Western Ry.*, 1991 WL 538758 (E.D. Va. 1991), includes no finding that the two terminals are virtually identical. That haphazard finding by the Fourth Circuit, not based on evidence, determined the outcome.

The Eighth Circuit Court of Appeals next relied upon the *Schwalb* statement quoted above as the singular factor for its determination that a Lambert's Point employee is *not* covered by the LHWCA. The Plaintiff in *Demay v. Norfolk Southern Ry.*, 592 F.3d 907 (8th Cir. 2010), worked as a railroad switchman just like Bynum; but his job was to spot the rail cars in the Barney Yard and set their handbrakes to keep them in place. *Id.* at 910. Other workers would later release the cars. In other words, he brought the cars up the hill; Bynum and the *Etheridge* plaintiff sent them down the hill. The *Demay* Court relied upon the same statement from *Schwalb* to reach its decision:

> [I]n a case involving a similar procedure for loading coal onto vessels, the Supreme Court stated that "the loading process begins when a hopper car is rolled down an incline to a mechanical dumper. . . ." The process here is very similar to that in *Schwalb*, and so the Supreme Court's explanation as to when the loading process begins guides us.

592 F.3d at 913-14. Because the *Demay* plaintiff had completed his task before that loading process had begun, he was not involved in the loading process and did not meet the status requirement of the Act. *Id.* at 914. The *Demay* Court construed the Supreme Court's holding to mean that activities that precede the release of cars down the hill are not integral to the loading process. *Id.* at 914-15. In effect, a new *Jensen* line is being drawn at the top of the Barney Yard hill.

Each of the circuit courts of appeal relied exclusively on what it took to be a finding by the United States Supreme Court about when a loading process begins in a coal terminal. *Schwalb*, however, did not even involve a loading issue. None of the three plaintiffs in *Schwalb* were engaged in switching or braking activity. Two of the plaintiffs were housekeeping and janitorial laborers cleaning up spilled coal beneath the conveyor belts. The third, Goode, was a machinist who repaired a retarder on the dumper. All three of these plaintiffs worked at or beyond the area where coal was dumped from rail cars; none had any activities relating to the "beginning" of the loading process. The circuit court orders, which this Court has reviewed, do not reflect that the trial judges received evidence and resolved any contested factual issues about when the loading process began; that was not an issue in any of the cases.

The Supreme Court does not reference the source for its comment about the beginning of the loading process. The decision of the Supreme Court of Virginia that it reversed, *Schwalb v. Chesapeake & Ohio Ry.*, 235 Va. 27 (1988), included no reference to or discussion of the beginning of the loading process or any description of contested factual issues that it resolved regarding that process. It is far from clear how the Supreme Court made a decision on a fact not relevant to the cases at bar that became the singular

decision point in two subsequent circuit court appellate decisions. More likely, the statement in the Supreme Court's decision provided a general description of the process but was not meant to serve as a binding resolution of a contested fact that would control subsequent factual controversies. Indeed, the railroad itself urged such a conclusion in its brief to the Eighth Circuit in *Demay*, arguing:

> When the loading process began was not even an issue in [*Schwalb*]. That was merely the Court's general description of what occurs at the terminal. And the Court, of course, lacked the detailed affidavits submitted here that describe the complex procedure by which the loading of various grades of coal is orchestrated. . . .

Reply Brief of Appellant-Petitioner Norfolk Southern Ry. Co., *Demay v. Norfolk Southern Ry.*, 2009 WL 2955454 at 7.

This Court would determine from the evidence presented that the loading process begins after the cars have been released from the Barney Yard, thawed, weighed, and staged in the Barney Pit by the Cargo Retarder Operator and Pusher Operator. This Court would find that the loading process begins no earlier than when the Dumper Operator sees the green light, signaling that the cars are staged in the Barney Pit and ready to go, and activates the Barney Mule to propel the car up the incline into the dumper. Emptying the coal from the cars onto the conveyor belts that lead to the ship, a process controlled by a different category of employees from the T&E employees who move cars, is the first task in loading the conveyor belts which carry the coal in the ship loaders and onto the vessel.

This Court would construe the maritime employment definition, tasks that are "integral to loading a ship," *Schwalb*, 493 U.S. at 47, to encompass activities actually involved in that loading process, including the maintenance of the equipment used in the loading process. Activities that precede the loading process, however important and necessary they may be, should not be deemed maritime employment. Many activities have to happen before coal can be loaded on a vessel. If all such activities are characterized as "integral to loading a ship," there would be no logical place to draw the line between LHWCA-covered and non-covered activities. All the workers in the yard would be covered by the LHWCA, because all perform work that is necessary to the ultimate task of getting coal onto ships.

This Court would adopt a more precise approach that maintains the focus intended by Congress to provide coverage to "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations and any harborworker including a ship repairman, shipbuilder, and shipbreaker. . . . " 33 U.S.C. § 902. Many longshoring activities could not take place unless other non-longshoring activities are successfully completed; but the fact that the longshoring

activity depends upon completion of an antecedent activity should not transform all of the antecedent activities into longshoring activities. This Court would therefore find that Bynum was not loading a vessel and thus not engaged in maritime employment at Lambert's Point; he was doing railroad work that precedes the loading of the vessel. His claim should lie under FELA and not the LHWCA.

This Court, however, is constrained by the decisions written by the federal courts of appeals that see this issue differently. A state court is not free to follow its own dictates or precedent in areas of federal substantive law in the face of federal authority to the contrary. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 245-46 (1942). The current state of the law seems to draw a new *Jensen* line at the top of the Barney Yard: the trainmen who set the cars in the Barney Yard are not engaged in vessel-loading and are entitled to exercise their rights under FELA; but those who then release the brakes on those very same cars are deprived of their FELA remedy. The *Etheridge* and *Demay* decisions, in the Court's view, misplace reliance on dicta in *Schwalb*; but any correction of this arbitrary and not particularly logical state of the law must be made by the federal courts that created it.

The Court therefore must find that Plaintiff was engaged in maritime employment as the term has been construed in the federal courts.

### C. *Plaintiff's Four Theories as to Why the LHWCA Is Not the Exclusive Remedy for Railroad Workers*

#### 1. *Actions at Law or in Admiralty*

The first of Bynum's four theories as to why the LHWCA is not the exclusive remedy for railroad workers comes from the language of the exclusivity provision. The LHWCA expressly excludes liability by the employer to the employee for "actions at law or in admiralty." 33 U.S.C. § 905(a). Bynum contends that this was intended to mean actions at *common law* or in admiralty but not actions created by Congress under federal statutes such as FELA. A FELA action is not a common-law action.

He supports this theory by relying on the legislative history that supports the conclusion that Congress never intended the 1972 amendments to cover railroad workers. As noted, however, Justice Stevens has already convincingly made the case to his colleagues on the Supreme Court in *Perini* that other occupations should not be covered; and the majority did not embrace that view.

Bynum's interpretation of the exclusivity language, "actions at law or in admiralty," does not withstand scrutiny. A complaint by a railroad worker against his employer under FELA is an "action at law." The LHWCA's text itself does not distinguish between actions at law arising from common law and those arising from statute. The text simply addresses actions at law or admiralty for "injury or death" under the LHWCA. Although the

many decisions referenced herein do not squarely address or interpret that language, this Court must conclude that federal courts considered a FELA action to be an action "at law." Otherwise, those courts would not have confirmed that LHWCA liability excludes FELA liability.

Controlling precedent establishes that LHWCA preempts any action at law, regardless of whether that action arises from common law or statute: "If respondents' injuries are covered by the [LHWCA] . . . the remedy provided by that Act is exclusive and resort may not be had to [FELA] . . . which provides a negligence cause of action for railroad employees." *Chesapeake & Ohio Ry. v. Schwalb*, 493 U.S. 40 (1989).

The Supreme Court of the United States has ruled that LHWCA liability is the exclusive remedy for railroad workers in maritime employment who attempt to assert FELA claims. *Pennsylvania RR. v. O'Rourke*, 344 U.S. 334, 338 (1953) (dismissing employee's FELA claim, and holding that "[t]he later Harbor Workers' Act . . . covered such injuries on navigable water and made its coverage exclusive."); *Nogueira v. New York, N.H. & H. RR.*, 281 U.S. 128, 137 (1930) (affirming dismissal of employee's FELA claim and holding that "[t]he [LHWCA] expressly provides that liability thereunder shall be exclusive and in place of all other liability of such employer to the employee, his legal representative . . . at law or in admiralty.") (internal citations omitted); *Schwalb*, 493 U.S. 40, 42 ("If respondents' injuries are covered by the [LHWCA], the remedy provided by that Act is exclusive and resort may not be had to [FELA], which provides a negligence cause of action for railroad employees.") (internal quotations omitted).

Bynum cites the Fourth Circuit case of *Conti v. Norfolk & Western Ry.*, 566 F.2d 890, 895 (4th Cir. 1977), as his authority that Congress did not intend to transfer claims of railroad workers from FELA to the LHWCA. In a later decision, however, the Fourth Circuit backed away from that holding with this ruling: "By concluding that whether employment constitutes traditional railroad employment is irrelevant to determining whether employment is maritime employment within the meaning of § 902(3), the *Schwalb* Court specifically repudiated the reasoning upon which the court based its *Conti* decision." *Etheridge v. Norfolk & W. Ry.*, 9 F.3d 1087, 1090 (4th Cir. 1993). That decision affirmed the dismissal of a FELA claim because of the exclusivity provision: "the LHWCA provides the exclusive remedy to covered employees and prevents those employees from suing their employer in tort." *Id.* at 1089. Because the court that decided *Conti* does not consider it good law, this Court will not follow it. Settled federal case law requires that Plaintiff's argument be rejected.

### 2. *FELA's Prohibition against Limiting the Rights of Railroad Workers*

Plaintiff argues that FELA's text prohibits LHWCA from being exclusive with the following language in 45 U.S.C. § 58: "Nothing in this act shall be held to limit the duty or liability of common carriers or to impair the

rights of their employees under any other Act or Acts of Congress." Plaintiff interprets this provision to mean that a railroad employer may not exempt itself from FELA liability by paying LHWCA benefits. He argues, "Congress intended, by the very specific language in FELA, to make clear that a railroad employee *always* has the right to bring a FELA action and *nothing*, including other Acts of Congress, can defeat that right." Plaintiff's Brief in Opposition to Plea in Bar at 16 (emphasis in original).

The Court reads the statute to confirm that FELA may not impair a railroad employee's rights under *other* Acts of Congress. It does not say the inverse, that other Acts of Congress may never impair an employee's FELA rights. The FELA language operates to protect an employee's other, non-FELA rights. It says nothing about Congress' prerogative to modify FELA remedies with later legislation.

### 3. Indemnification in FELA as Supporting the Right To Bring a Claim after Receiving Benefits

Plaintiff cites 45 U.S.C. § 55, a FELA provision that permits the railroad the right to set off any benefit or sums that it has paid to an injured employee against a judgment awarded under FELA. He argues that the set off provision is "meaningless unless the railroad pays the injured employee compensation. . . . Congress specifically anticipated a railroad worker would receive some form of compensation and gave the railroad credit for those payments." Brief in Opposition at 17.

This argument does not seem to address whether the LHWCA, a statute enacted *after* the FELA language quoted above, was intended to be exclusive of a railroad worker's FELA rights. Presumably, if a railroad worker has received LHWCA benefits, that worker can still pursue a FELA claim if he establishes that he was not engaged in maritime work at the time of his injury. In that situation, the indemnification provision would apply and allow the railroad the right of set off. There may be other compensation schemes under other federal statutes that Congress anticipated would cover railroad workers and make available the right of set off that FELA created. The existence of the right, however, does not shed any light on what Congress intended with its later adoption of LHWCA and its exclusivity provision.

### 4. Interpretation of the LHWCA as a Repeal of FELA

Fourth, the Plaintiff argues that LHWCA application here would effectively repeal FELA. The U.S. Supreme Court addressed this precise argument in its 1930 decision in *Nogueira v. New York, N.H. & H. RR.*, 281 U.S. 128 (1930). The plaintiff had been injured on a car float used in the transportation of railroad cars. *Id.* at 130. He appealed the dismissal of his FELA claim and argued, *inter alia*, that the proposed interpretation of the LHWCA exclusivity provision would work a repeal by implication of

FELA. The Court held otherwise, reasoning that there was no repeal by implication, because a railroad worker engaged in maritime employment could still bring his FELA action if his employer failed to provide the compensation required by LHWCA. *Id.* at 137.

This Court recognizes that the LHWCA, enacted after FELA, certainly narrows the scope of FELA to exclude railroad workers engaged in maritime employment; but FELA continues to be an available remedy for those railroad workers whose employment duties are not essential to the loading or unloading of vessels. In the many Supreme Court decisions recognizing that the LHWCA exclusively covers railroad injuries, it has not stated that the later statute worked a repeal by implication of the earlier-enacted FELA.

## D. *Plaintiff's Attempt To Sue the Railroad under the LHWCA's "Two-Hats" Theory*

Plaintiff's "two hats" argument highlights the inconsistencies between the LHWCA's treatment of railroad workers and longshoreman. Section 905(b) of the LHWCA preserves a longshoreman's right to sue the owner of a vessel for negligence. The U.S. Supreme Court has confirmed that the exclusivity bar of the LHWCA does not prohibit an employee from suing his employer under § 905(b) when his employer owns the vessel. As the Court held in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983):

> If respondent had been employed by an independent stevedore at the time of his injury, he would have had the right to maintain a tort action against the vessel. We hold today that he has the same right even though he was in fact employed by the vessel.

*Id.* at 532

Plaintiff argues that a railroad worker should have the same right as a longshoreman to sue his employer in its capacity as owner rather than employer. He acknowledges that applying this *Pfeifer* rule to railroads is "problematic because railroads are not stevedores and railroad activities are not defined in the LHWCA." He points out that applying the LHWCA to railroad workers "lead[s] to absurd results." Nonetheless, he argues that he should have the same right as a longshoreman to bring a lawsuit against his employer in its owner hat.

Defendant correctly argues that the LHWCA's exception for claims against a vessel does not apply. Congress included Section 905(b) in the LHWCA to preserve the longstanding maritime right of action against a vessel for unworthiness. *Pfeifer*, 462 U.S. at 531, n. 7. This history of longshoremen's remedies against vessels in not analogous to railroads.

Railroads, therefore, do not "wear two hats" for purposes of the LHWCA. In this case, if Defendant owned a vessel and Bynum was injured due to negligence relating to that vessel, the LHWCA would not bar him

from maintaining a third-party cause of action against Defendant. Because that is not the case here, the LHWCA exclusivity provision is applicable; and § 905(b) does not create an exception that applies to Plaintiff.

## Conclusion

For these reasons, Defendant's Special Plea in Bar is sustained, and Plaintiff's case is dismissed.